**Jenkin Lloyd JONES, and Jenkin Lloyd Jones, as Relator, Petitioner,**

v.

**Leo WINTERS, Secretary of the State Election Board of Oklahoma, et al., Respondents.**

**No. 39785.**

Supreme Court of Oklahoma.

Oct. 3, 1961.

**358**

Samuel A. Boorstin, Tulsa, for petitioner.

Mac Q. Williamson, Atty. Gen., of Oklahoma, Fred Hansen, First Asst. Atty. Gen., for respondents.

J. A. Rinehart, El Reno, Amicus Curiae.

WILLIAMS, Chief Justice.

Mr. Jenkin Lloyd Jones, a citizen of Tulsa, Oklahoma, hereinafter referred to as petitioner, has filed herein an application praying that this Court assume jurisdiction in this original proceeding. In his petition attached to such application, he alleges that the Twenty-eighth Oklahoma

Legislature passed Senate Bill 179; that such bill reapportioned the area of the state into forty-four Senatorial Districts and increased the number of members of the State Senate from forty-four to fifty-two; that under said Bill one Senator would be elected from each of five certain named Senatorial Districts with respective population figures of from 13,125 to 16,598; that, on the other hand, another certain District with a population of 61,866 would have only one Senator; that "going to the opposite extreme of congested population, No. 39, consisting of Tulsa County, has a population of 346,038, with 3 Senators proposed, being an average of 115,346 per Senator; and No. 18, consisting of Oklahoma County, has a population of 439,506, with 3 Senators proposed, or an average ratio of 146,502 per Senator." He contends the bill is invalid, unconstitutional, disproportionate and unjust but that nevertheless the State Election Board and its members are contemplating accepting and acting under said Senate Bill as if it were a valid and lawful act and are about to execute and carry out such allegedly illegal and unconstitutional reapportionment "unless restrained, prohibited, stopped or properly commanded to do their just, legal, valid and constitutional duties."

Attached to his petition is a brief in support of Petitioner's proposition (that such Senate Bill 179 is unconstitutional, invalid and void, etc.).

Respondents have filed their response and supporting brief. Their first proposition is that said Senate Bill 179 was vetoed by the Governor and not thereafter validly passed by the legislature over such veto.

In considering the proposition we are mindful of the facts hereinafter recited. First the Senate and then the House of Representatives of the regular session of the Twenty-eighth Legislature of the State of Oklahoma passed Senate Bill 179. By its provisions there were created forty-four Senatorial Districts, as required by Constitution of the State of Oklahoma, Article V, Section 9(a), the counties comprising the respective districts were designated and the number of Senators to be elected from each of such respective districts fixed. Included as section 8 of such bill was what is familiarly called the emergency clause.

Governor Edmondson promptly vetoed such bill upon the asserted ground it was in direct conflict, in his opinion, with such Article 5, Section 9(a) of such Constitution.

The Senate then, upon a reconsideration of such bill, by a vote of 33 ayes to 6 nays, voted to pass it notwithstanding such veto and by the same vote purported to again pass the emergency clause contained therein as section 8 thereof notwithstanding such veto. The Senate then had forty-four members.

The House of Representatives then upon a reconsideration of such bill, voted by a vote of 82 ayes to 32 nays to pass such bill notwithstanding such veto and thereafter purported to pass the emergency clause of said bill, notwithstanding such veto by a vote of 93 ayes to 21 nays. Such House then had one hundred and twenty-one members.

The message from Secretary Winters of the Oklahoma State Senate to Secretary of State Christian accompanying said Senate Bill 179 recites as follows:

"By order of the Senate of the State of Oklahoma this message is sent advising that on this date the Senate passed Senate Bill 179 by a vote of 33 Ayes, 6 nays on the Bill and a vote of 33 ayes and 6 nays on the Emergency notwithstanding the veto of the Governor of the State of Oklahoma and that thereafter on this date the Oklahoma House of Representatives passed Senate Bill 179 by a vote of 82 ayes and 32 nays on the bill and a vote of 93 ayes and 21 nays on the Emergency notwithstanding the veto of the Governor of the State of Oklahoma. I am now directed by the Senate of the State of Oklahoma to transmit the above named Bill directly to you."

The Attorney General, for respondents, argue that Senate Bill 179 was passed by

each of the Houses of the Legislature and had the emergency clause attached before the bill was sent to the Governor for his consideration; that it had then become an emergency measure and that after it was vetoed a three-fourths vote by all of the members of each House was required to pass said bill over the Governor's veto; that the House of Representatives passed the bill after the veto by a vote of less than three-fourths of such members; that there could be only the one vote and that the purported three-fourths vote for the emergency clause was mere surplusage and but a nullity. Not involved herein is the question of the effect had a vote been taken upon a technical legislative motion to reconsider. Such a motion was not lodged nor was such a vote taken.

Petitioner argued only the unconstitutionality of the Senate Bill. His counsel expressed no opinion as to whether it was validly passed over the Governor's veto.

■ It is elementary that a court should, prior to delving into the intricacies of a suit before it, first determine whether it has jurisdiction, i. e., jurisdiction of the parties to the suit, jurisdiction of the subject matter involved in the suit and jurisdiction to render the particular judgment sought or that it is determined should be rendered in the case (if the court does have jurisdiction).

See State ex rel. State Highway Commission v. Asendorf, 203 Okl. 263, 220 P.2d 272; and Hutchins v. Sperling, Okl., 316 P.2d 589; Roth v. Union National Bank of Bartlesville, 58 Okl. 604, 160 P. 505.

Our Constitution provides as follows:

"The powers of the government of the State of Oklahoma shall be divided into three separate departments: The Legislative, Executive, and Judicial; and except as provided in this Constitution, the Legislative, Executive, and Judicial departments of government shall be separate and distinct, and neither shall exercise the powers properly belonging to either of the others." (Article IV, Section 1).

It further provides as follows:

"The courts of justice of the State shall be open to every person, and speedy and certain remedy afforded for every wrong and for every injury to person, property, or reputation; and right and justice shall be administered without sale, denial, delay, or prejudice." (Article II, Sec. 6)

Such Constitution also provides that:

" * * * An apportionment by the Legislature shall be subject to review by the Supreme Court at the suit of any citizen, under such rules and regulations as the Legislature may prescribe. And such court shall give all cases involving apportionment precedence over all other cases and proceedings; and if said court be not in session, it shall convene promptly for the disposal of the same." (Article V, Sec. 10(j).

Same further provides that:

"The election shall be free and equal * * *" (Article III, Sec. 7). Our Constitution further provides:

" * * * The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all commissions and boards created by law. The Supreme Court shall have power to issue writs of habeas corpus, mandamus, quo warranto, certiorari, prohibition, and such other remedial writs, as may be provided by law, and to hear and determine the same; and the Supreme Court may exercise such other and further jurisdiction as may be conferred upon it by law * * *" (Article VII, Section 2.)

In the case of Jones v. Freeman, et al., 193 Okl. 544, 146 P. 2d 564, 566, (syllabus paragraph 11) we said:

"Any citizen of the state is entitled to maintain an original action in the Supreme Court, under authority of Art. VII, Sec. 2 of the Constitution, to test the constitutionality of legislative ap-

portionment acts and to enforce the judgment in such case by the proper writ."

As said by the Supreme Court of Iowa in Carlton v. Grimes, Treasurer, 237 Iowa 912, 23 N.W.2d 883, 892, "The power to determine the regularity of the passage of a legislative enactment is vested in the courts."

As said by the Supreme Court of Montana in Vaughn & Ragsdale Co., Inc. v. State Board of Equalization et al., 109 Mont. 52, 96 P.2d 420, 422, "This court has the power to declare a legislative Act invalid * * *"

In Jones v. Cordell, 197 Okl. 61, 168 P.2d 130, we said:

"The Supreme Court may, in its discretion, restrain election officials from conducting an election under an unconstitutional law."

If we may restrain the conducting of an election under an unconstitutional law, certainly we may restrain the conducting of an election under a purported law not actually passed.

We have reviewed the pertinent provisions of the Constitution relative to our duties in the premises. We find from the foregoing facts and provisions of law and the files in the case that petitioner is entitled to file his petition herein, that this Court should and it has accepted jurisdiction in the case and that we have jurisdiction in the several respects to which reference was hereinabove made.

We now move to a consideration of the matter of whether Senate Bill 179 of the legislative session just recently ended was lawfully passed notwithstanding the veto thereof by the Chief Executive.

Article V, Section 34, of our State Constitution provides in part as follows:

"* * * (N)o law shall be passed unless upon a vote of a majority of all the members elected to each House in favor of such law; * * *"

In part pertinent to this discussion, Article VI, Section 11, of such Constitution is of provision as follows:

"Every bill which shall have passed the Senate and House of Representatives, and every resolution requiring the assent of both branches of the Legislature, shall, before it becomes a law, be presented to the Governor; if he approve, he shall sign it; if not, he shall return it with his objections to the house in which it shall have originated, who shall enter the objections at large in the Journal and proceed to reconsider it. If, after such reconsideration, two-thirds of the members elected to that house shall agree to pass the bill or joint resolution, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered; and, if approved by two-thirds of the members elected to that house, it shall become a law, notwithstanding the objections of the Governor. In all such cases, the vote in both houses shall be determined by yeas and nays, and the names of the members voting shall be entered on the Journal of each house respectively * * *"

Article V, Section 58, of such Constitution provides in pertinent part, as follows:

"No act shall take effect until ninety days after the adjournment of the session at which it was passed, except enactments for carrying into effect provisions relating to the initiative and referendum, or a general appropriation bill, unless, in case of emergency, to be expressed in the act, the Legislature, by a vote of two-thirds of all members elected to each House, so directs. An emergency measure shall include only such measures as are immediately necessary for the preservation of the public peace, health, or safety, * * * Emergency measures may be vetoed by the Governor, but such measures so vetoed may be passed by a three-fourths vote of each House, to be duly entered on the journal."

Thus, to recapitulate, we see that a majority of all the members elected to each

House must vote for an ordinary (non-emergency) bill in order for it to pass (Const. Art. V, § 34); that excepting certain acts relating to the initiative and referendum and general appropriation bills, two-thirds of all members elected to each House must vote for the emergency portion of a bill·in order for it to pass (Const. Art. V, § 58); that, upon reconsideration of an ordinary (non-emergency) bill after veto, two-thirds of the members elected to each of the respective houses must approve it to pass it notwithstanding the objections of the Governor (Const. Art. VI, § 11); upon reconsideration of an emergency measure after veto, a three-fourths vote of each House is required to pass it notwithstanding the objections of the Governor (Const. Art. V, § 58).

It was noted hereinabove that the certificate of the Senate Secretary showed plainly and clearly that the vote on the bill in question in the House was "82 ayes and 32 nays on the bill and a vote of 93 ayes and 21 nays on the Emergency notwithstanding the veto of the Governor of the State of Oklahoma." In that certificate, it is not recited that the second vote in the House (after veto) was upon a motion to reconsider. Rather it clearly appears that such was a vote on the "Emergency".

In 50 Am.Jur., page 110, Statutes § 111, it is stated:

"* * * The bill becomes a law, notwithstanding the executive veto, if, after reconsideration, it is again passed by both houses in the mode prescribed."

In 82 C.J.S. Statutes § 58, Passage over Veto, at page 91, it is stated:

"The power of the legislature to re-pass a bill that has been vetoed by the executive, after its return to the legislature, is derived from the constitution, and a bill may become law where passed over the governor's veto in accordance with constitutional provisions. * * *"

In said Am.Jur., at page 103, Statutes § 96, it is stated,

"* * * After independence of the Colonies, the veto power was adopted with various limitations by American Constitutions, state and national. Originally intended merely as a means of self-protection by the executive against the encroachments of the legislative body it has since been used as a check on hasty and inconsiderate, as well as unconstitutional legislation."

From the facts above related, it would appear that the House of Representatives was of the view that it could and should take separate votes on the bill and on the emergency section thereof as is done in passing a bill with emergency clause prior to submission to the Governor.

Apparently the House of Representatives thought it was incumbent upon it to pass the Senate Bill in question, after veto, by the vote provided for a non-emergency bill, that is to say, by a two-thirds vote, as indicated by Constitution, Article VI, Section 11, and then by a separate vote to pass the emergency section thereof by a three-fourths vote as provided by Constitution, Article V, Section 58.

Therein it erred. Clearly the House considered that it had passed the bill by a two-thirds vote and a sufficiently large majority to comply with all constitutional and legal requirements, and moved as it thought to a consideration of the next proper order of business, to-wit: whether the emergency section should be attached.

In Norris v. Cross, 25 Okl. 287, 105 P. 1000, 1007, referring to Constitution, Article V, Section 58, this Court said:

"The word 'enactment,' as used in the saving clause, is synonymous with the word 'act.' It is to be noted that the language of this clause excepts only 'enactments,' and not 'enactments or parts of enactments,' putting in force the initiative and referendum provisions of the Constitution. The word 'act,' as used in the general enacting clause of section 58, means a bill passed by the Legislature, as to which all of the formalities required to make

it a law have been performed, and refers to the entire statute enacted, * * *"

It is our view that Senate Bill 179 was first passed by the respective Houses of the Legislature, with emergency section included, and that, prior to veto, it had become an enactment, an integrated whole, an act, an emergency measure, within the meaning of Article V, Section 58. No provision is made in that section or elsewhere in the Constitution for "piecemeal" balloting upon reconsideration of an emergency measure that has been vetoed.

Our conclusion is that the House of Representatives, upon reconsideration of the bill in question after veto, simply did not pass it by the three-fourths vote required by the Constitution in such case. We further conclude that the purported or attempted vote, separate and apart and distinct, upon the emergency section was a nullity and entirely without any force and effect.

Amicus Curiae has favored this Court with a brief presenting arguments to the effect that, (1) Senate Bill 179 was passed over the Governor's veto; (2), that "Article 5, Sec. 9(a) and 9(b) Oklahoma Constitution does not confine the Legislature to sole consideration of population in apportionment of Senate; The Provision, 'Or In Such Manner As The Legislature May Direct,' Gives A Choice Or Alternative Enlarging The Conditions Or Methods Which May Be Considered By It." And, (3), that "There is a Presumption that an Act Enacted by the Legislature, is Constitutional and Where One Interpretation Will Render The Act Unconstitutional While Another Will Not, It Is The Courts Duty To Interpret The Act As To Render It Constitutional."

In argument under his first proposition amicus curiae states as follows:

"In the first place the contention that the bill had to pass as an emergency matter is extremely doubtful. The emergency clause has nothing to do with the law except as to the time of its taking effect.

"Article 5, Sec. 58, does not say that the law could not pass without the emergency clause. It only says that a three-fourths vote is required to pass it as an emergency measure over the veto of the Governor."

We have hereinabove determined that Senate Bill 179 was an integrated, emergency measure.

The Court's friend argues that Article VI, Section 11, does not state that bills other than emergency bills but "says, 'Every bill which shall have passed the Senate and the House * * *' and which has been vetoed by the Governor shall be reconsidered, and after consideration if two-thirds members of both houses approve the bill, 'It shall become a law notwithstanding the objections of the Governor.' "

In the case of Latting v. Cordell, 197 Okl. 369, 172 P.2d 397, 399, this Court said:

"It is a universally recognized rule of construction that, in ascertaining both the intent and general purpose, as well as the meaning, of a constitution or a part thereof, it should be construed as a whole. As far as possible, each provision should be construed so as to harmonize with all the others, yet with a view to giving effect to each and every provision in so far as it shall be consistent with a construction of the instrument as a whole. 16 C.J.S., Constitutional Law, § 23, page 62, citing cases from practically every state in the Union, including Finerty v. First Nat. Bank, 92 Okl. 102, 218 P. 859, 32 A.L.R. 1326."

Our discussion hereinabove demonstrates it to be our conclusion that under Article V, Section 58, Const., a different rule applies to an emergency measure than the rule under Article 6, Section 11, applicable to bills other than emergency measures, despite failure of either of such sections to specifically refer to the other. This conclusion we believe to be justified by a

consideration of such sections together and under the rule of para materia.

Amicus curiae argues further that the procedure followed in the House of Representatives was valid in that the House first overrode the Governor's veto by a two-thirds vote (Art. VI, Sec. 11), and then by another roll call passed Senate Bill 179 as an emergency measure by a three-fourths vote (Art. V, Sec. 58) and also in conformity to House Rule 33. He argues that it would make no difference if the House considered the Bill again and again, if it finally passed the same as an emergency measure, and that the "Journals of both House and Senate show three-fourths of the members of both houses approved the emergency character of Senate Bill 179 * * *" He refers to a ruling of the Chair in the House in 1953, contrary to that of the Attorney General in a letter to a House Member. He quotes House Journal of Twenty-Fourth Legislature, page 794, as follows:

"Mr. Stevens moved that the House adhere to the Ruling of the Chair given yesterday concerning vetoes. *The Chair will hold that a two-thirds majority of all members elected to and constituting the House is required to over-ride disapproval of the Governor on any Bill passed by the House and returned by the Governor and a three-fourths vote of all members elected to and constituting the House is required to over-ride a Veto of the Bill as an emergency measure.* Upon motion of Mr. McCarty, the Stevens motion was adopted and the above Ruling of the Chair stands."

He says, "These references to the Journal reflect that the House placed its own interpretation on its rules which had existed for 46 years, now for 54 years." He cites in support of argument the case of State ex rel. Coleman v. Lewis, 181 S.C. 10, 186 S.E. 625.

It is noted that Rule 33 of the House, as quoted in brief of amicus curiae, makes no reference to an emergency measure.

That a House (Branch of the Legislature) may make its own rules is beyond dispute. As stated in State v. Lewis, supra, referred to by amicus curiae, (at page 22 of the South Carolina Report, at page 630 of 186 S.E.) :

"The Constitution empowers each House to determine its rules and proceedings. Neither House may by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of procedure established by the rule and the result which is sought to be obtained, but within these limitations all matters of method are open to the determination of the House, and it is no impeachment of the rule to say that some other way would be better, more accurate, and even more just."

We observe, however, that the South Carolina case related not to the passage of an emergency measure as is true here, but to the matter of a bill, upon consideration after veto, "picking up" more yeas upon a motion to reconsider upon a subsequent legislative day. We have determined hereinabove that the second consideration in the House of Senate Bill 179 with which we are here concerned was not upon a technical legislative motion to reconsider after failure of the Bill to pass after veto, but was upon what the House conceived to be a vote upon the emergency phase of the measure. This occurred after the Bill itself as an integrated emergency measure upon a constitutional reconsideration after veto had failed to pass by a three-fourths vote in the House, although the House apparently thought it had passed.

Amicus curiae says, "If the Senate wants to have one roll call and the House wants to have two roll calls there is nothing in the Constitution to prohibit it so long as three-fourths of the members of each House say on the Journal they vote for it as an emergency matter."

We agree that had the second vote in the House upon constitutional reconsideration after veto occurred upon technical legislative motion to reconsider as in the cited South Carolina case and the bill then re-

ceived a three-fourths vote as required by Constitution, Art. V, Section 58, the veto would have been lawfully overridden in the House. Such, however, was not the case.

Amicus curiae says that the message from Secretary of Senate to Secretary of State transmitting the enrolled bill shows that the bill passed under the provisions of either or both Article V, Section 58, or Article VI, Section 11, of the Constitution. He adds that, "Oklahoma has long subscribed to the rule that the Enrolled Bill is conclusive and the courts will not look behind it." (Citing authorities).

We refer again to our foregoing discussion as to the effect of Article V, Section 58. To pass an emergency measure over Governor's veto, a three-fourths vote of each House is required. It is true that the message from Secretary of Senate to Secretary of State recites that "on this date the Oklahoma House of Representatives passed Senate Bill 179". But the Secretary continued, "by a vote of 82 ayes and 32 nays on the bill * * *" The vote thereby reported (required by Article V, Section 58, to be entered on the Journal) demonstrated its own inefficacy.

Our disposition of respondents' first proposition and of the first proposition of amicus curiae renders consideration of propositions second and third advanced by amicus curiae unnecessary and improper.

Respondents, in their second proposition, seek to distinguish petitioner's authorities submitted upon the question of the alleged unconstitutionality of said Senate Bill 179.

As such bill was not lawfully passed over the Governor's veto, any discussion as to its constitutionality or want thereof is deemed inappropriate.

■ It is accordingly ordered that respondents, and the successors in office of the latter two of them under recent executive appointment, take no action whatsoever to carry into effect the provisions of said purported Senate Bill 179 of the Twenty-eighth Oklahoma Legislature as same is but a nullity.

We direct that any petition for rehearing be filed within five days of the date of promulgation of opinion herein.

Writ ordered issued.

BLACKBIRD, V. C. J., and WELCH, DAVISON, HALLEY, JOHNSON, JACKSON and IRWIN, JJ., concur.

BERRY, J., concurs specially.

BERRY, Justice (concurring specially).

While I agree with the majority that the State Election Board should be restrained and prevented from proceeding under Senate Bill No. 179, my reason for so agreeing differs from that of the majority.

Petitioner contends that Senate Bill No. 179, hereafter referred to as "bill", clearly violates the provisions of Art. V, Sec. 9(a), of the Okla.Const. and accordingly should be declared to be invalid by this Court.

Respondents contend that the bill was an emergency measure and as such, the Governor's veto of the bill could (under provisions of Art. V, Sec. 58 of the Okla.Const.) only be overridden by not less than a three-fourths vote of the members of each House; that while three-fourths of the members of each House voted "aye" on the emergency clause, three-fourths of the members of the House of Representatives did not so vote on the bill proper; that for said reason the bill was not, in fact, passed over the Governor's veto by said House of Representatives. In the alternative, respondents contend that in any event the matter of apportioning either House is a legislative or political and not a judicial matter.

For reasons hereafter stated, I am of the opinion that the bill must be considered as having passed each House but that the bill is unconstitutional and that this Court should therefore hold that the bill is inoperative.

Respondents apparently appreciate that this Court is committed to the "enrolled rule". Under this rule an enrolled bill filed in the office of the Secretary of State imparts absolute verity, and for said reason it

may not be shown that the bill was not regularly passed. See Goddard v. Kirkpatrick et al., 193 Okl. 92, 141 P.2d 292, and cited cases. The fact that the Governor vetoed the bill does not serve to distinguish the referred-to cases. In 50 Am.Jur. "Statutes", Sec. 114, p. 111, it is stated that "under the enrolled rule, prohibiting the court from going behind the enrolled bill to inquire into the regularity of the enactment of the law, it has been held improper to show that the passage of the law over the chief executive's veto was without the prescribed formalities."

In an effort to escape the force of the referred-to rule, respondents point to a message from the Secretary of the Senate which was sent to the Secretary of State along with the enrolled bill. This message shows the vote of each House on the bill proper, and on the emergency clause following the Governor's veto of the bill. It shows further that the bill proper did not receive a three-fourths vote of the members of the House of Representatives.

I am of the conviction that the message was not a part of the enrolled bill and for said reason cannot be considered in reaching a decision on the issue of whether the bill was passed over the Governor's veto. The statute treating with enrolling a bill is 75 O.S.Supp.1959 § 12a. In so far as pertinent, it provides that upon passage of a bill it shall be enrolled by the House in which it originated; that following enrollment it shall be "signed" by the presiding officers of each House and shall then be "filed" in the office of the Secretary of State. The bill shows that the statute was complied with and for said reason the bill must be treated as a duly enrolled bill.

Respondents point to the fact that the enrolled bill shows that it was vetoed by the Governor and assert that the bill fails to show that it was passed over the veto. I am unable to agree. The bill shows that it was filed with the Secretary of State, which fact definitely tends to prove that the bill was passed following and over the veto. It is provided in Art. VI, Sec. 11, and Art. V, Sec. 58 of the Okla.Const. that

a vetoed bill may be reconsidered by the Legislature and that the veto may be overridden if a sufficient number of votes is mustered in each House. The presumption lies that officers and officials have discharged the duties imposed upon them by law (Hicks et al. v. Sanders, 132 Okl. 242, 269 P. 297), and it must therefore be presumed that the Legislature by requisite vote passed the bill over the Governor's veto before filing it with the Secretary of State. I submit that to hold otherwise would be tantamount to holding that the Senate perpetrated an illegal act by sending to the Secretary of State a vetoed bill which had not been reconsidered by the Legislature, or if reconsidered, one which had not passed. While I appreciate that a presumption may be overcome by evidence, I am convinced that the mere showing that the bill was vetoed by the Governor does not overcome the referred-to presumption where it clearly appears that the bill was filed with the Secretary of State on a date subsequent to the veto.

If I were convinced that the message could be considered as a part of the enrolled bill, I would nevertheless be of the opinion that the bill proper was passed by the House of Representatives over the Governor's veto.

In so far as pertinent, it is provided in Art. VI, Sec. 11, supra, that a veto may be overridden by a two-thirds vote of the membership of each House. More than two-thirds of the members of each House voted "aye" on both the bill proper and three-fourths so voted on the emergency clause following the Governor's veto. Respondents assert that this is without significance for the reason it is provided in Art. V, Sec. 58 that three-fourths of the members of each House must vote in favor of an emergency bill to override the Governor's veto.

To my way of thinking, the referred-to constitutional provisions must be construed together and when so construed it is apparent that the first cited section was directed to the bill proper and the second to the emergency clause of a bill. The sole pur-

pose of an emergency clause is to cause a bill to become effective immediately upon being approved by the Governor or upon being enacted over the veto of the Governor. An enacted bill which bears an emergency clause is therefore not subject to a referendum. It is apparent to me that in order to give some effect to the veto of a bill with an emergency clause, the members of the constitutional convention concluded that unless the clause was overridden by a three-fourths vote, and notwithstanding an overriding of the veto to the bill itself, the measure would be subject to being referred to a vote of the people. This, in my opinion, was the purpose of Art. V, Sec. 58.

My construction of the foregoing constitutional provisions accords with that placed thereon by the Legislature in the past. In voting on a bill carrying an emergency clause, separate votes, as in the instant case, are had on the bill and on the emergency clause. Following Constitutional Law, Vol. 4, part 1, West's Okl. Dig., cases are cited sustaining the proposition that the construction placed upon a constitutional provision by public officers and officials will be given weight and consideration in interpreting the provision.

I am of the firm conviction that this Court has jurisdiction of the case, and feel very strongly that since it has jurisdiction, an opinion on the merits should be promulgated. I add, that it is a matter of common knowledge that the public is very much interested in reapportioning each House in accordance with the mandate of the Constitution, and that some citizens have, in fact, organized for the purpose of attempting to bring about a reapportionment of said bodies. The aim and desire of numerous citizens can well be appreciated when it is remembered that each House has for many years declined to reapportion itself in accordance with the mandate of our Constitution.

It is provided in Art. V, Sec. 10(j), that "An apportionment by the Legislature shall be subject to review by the Supreme Court at the suit of any citizen, under such rules and regulations as the Legislature may prescribe." Jones v. Cordell et al., 197 Okl. 61, 168 P.2d 130, and Jones v. Freeman et al., 193 Okl. 554, 146 P.2d 564, represent authority sustaining the proposition that this Court has jurisdiction of the instant action. Since this Court has jurisdiction of the case, I am of the conviction that an opinion on the merits should be promulgated.

It is apparent that the matter of apportioning the Senate in accordance with the mandate of the Constitution would bring about an abrupt and drastic change in senatorial districts as they have existed for over 50 years. The change would cause many senatorial districts, in fact the majority, to lose in part the voice that they have had in the Senate since statehood. It is only natural that a majority of the citizens which would be affected adversely would look with disfavor upon the change and that their thinking and wishes would, in so far as is proper, be respected by their representatives. Thus the matter of apportioning the Senate presented an arduous task to a great many Senators. While I am convinced that members of the Senate worked long and conscientiously on the legislation before us and that they no doubt thought the apportionment made by said legislation was in keeping with the Constitution, I entertain no doubt but that the bill clearly violates the provisions of Art. V, Sec. 9(a) of the Okla.Const. It is provided in the cited section that the Senate shall be "divided into forty-four districts"; that the membership of the Senate shall not be less than 44; that "in [the] event any county shall be entitled to three or more senators at the time of any apportionment such additional * * * senators shall be given such county"; that each senatorial district shall "contain as near as may be an equal number of inhabitants"; that inhabitants are to be determined in accordance with the current Federal census or in such manner as the Legislature may direct.

The following figures clearly show that the bill does not comply with the last cited

section of the Constitution. The last Federal census shows the population of Oklahoma to be 2,328,284. This figure divided by 44 develops that the population of each senatorial district should be approximately 52,915. The referred-to census shows that two of the senatorial districts created by the bill have a population under 16,000; that two have a population under 17,000; and one has a population under 18,000. Under the bill each of said districts would be allowed one senator. Tulsa County, with a population of 346,038, would be allowed only three senators and Oklahoma County, with a population of 439,506, would also be allowed but three senators. Lincoln and Pottawatomie Counties, with a combined population of 60,269, would, as a senatorial district, be allowed two senators; Osage and Washington Counties, with a combined population of 74,788, would, as a senatorial district, be allowed two senators; and Comanche and Cotton Counties, with a combined population of 98,834, would, as a senatorial district, also be allowed two senators.

In the amicus curiae brief filed herein, it is contended that "Article 5, Sec. 9(a) Oklahoma Constitution does not confine the Legislature to sole consideration of population in apportionment of Senate; the Provision, 'Or In Such Manner As The Legislature May Direct,' gives a choice or alternative enlarging the conditions or methods which may be considered by it."

The language that is quoted in the above contention appears in the last sentence of Art. V, Sec. 9(a), which sentence reads in part thus:

"* * * Said districts shall be numbered from One to Forty-four inclusive, and each of said districts shall contain as near as may be an equal number of inhabitants, such population to be ascertained by the next preceding Federal census, or in such manner as the Legislature may direct, and shall be in as compact form as practicable * * *"

The phrase "or in such manner as the Legislature may direct" is used as to make clear that it relates to the matter of determining the population of the State and of the several senatorial districts in apportioning the Senate. The phrase, therefore, does not justify nor contemplate the consideration of the area of senatorial districts in apportioning the Senate. The fact that the quoted language authorizes the Senate to arrive at the population of the State and of the several senatorial districts by means other than the preceding Federal census is wholly without significance. I so say for the reason that the bill before us makes clear that the Senate elected to use the last Federal census as a basis for determining population.

I am of the conviction that the bill does not pretend to reapportion the Senate so that each senatorial district shall "contain as near as may be an equal number of inhabitants". Such being the case, I am convinced that the bill is unquestionably unconstitutional. For authority tending to sustain my conclusion in the foregoing particulars, see cases cited at pages 1350-1353 of the annotated notes beginning at page 1337 of 2 A.L.R. The annotator summarizes the holding of the cases that he cites thus:

"* * * The effect of the cases may, however, be broadly expressed in the statement that inequality of population or lack of compactness of territory will not necessarily invalidate an apportionment; but the question in all cases must be whether there has been such a variation from the standard of equality and compactness as clearly to indicate that the legislature or other apportioning body has exceeded or failed to exercise its discretion in the matter."

Beginning at page 1339 of the above referred-to annotated notes, cases are cited in support of the annotated note to the effect that "It is well settled that the passage of apportionment acts is not so exclusively within the political power of the legislature as to preclude a court from inquiring into their constitutionality when the question is properly brought before it." As I read Jones v. Cordell and Jones v.

Freeman, supra, this Court has made clear that an issue such as is presented by the instant case will be treated as a judicial and not a purely political matter and that the jurisdiction bestowed upon the Court by Art. V, Sec. 10(j), supra, and other provisions of the Constitution and by the statutes will be exercised.

In view of the fact that the bill clearly violates the Constitution; that this Court unquestionably has jurisdiction of this case; that in exercising jurisdiction the Court will not be directing the Legislature to act, and to the contrary we will merely consider its actions in the light of the Constitution; that unless the Court acts the bill will in fact become operative for the reason that it was, in my opinion, passed by both Houses, I am of the opinion that the bill should be stricken down as clearly violating the Constitution.