**MUSKOGEE URBAN RENEWAL AUTHORITY and the City of Muskogee, Appellees,**

v.

**The EXCISE BOARD OF MUSKOGEE COUNTY, and Muskogee County, Oklahoma, Appellants,**

and

**First National Bank & Trust Company, Intervenor.**

No. 74424.

Supreme Court of Oklahoma.

June 27, 1995.

---

John David Luton, Asst. Dist. Atty., Muskogee County, for appellant.

Steve Cousparis and Robert DuPriest, Muskogee, for appellees.

A. Carl Robinson, Robinson, Locke, Gage, Fite & Williams, Muskogee, for intervenor.

## OPINION ON REHEARING

PER CURIAM:

The first impression issue presented in this appeal is whether tax increment financing of urban renewal costs violates the state constitution. We hold that the statutory scheme for financing and paying the costs of urban renewal established in 11 O.S.Supp.1983, § 38–115 and § 38–120, et seq., does not in and of itself contravene the provisions of the Oklahoma Constitution. However, such tax increment financing is subject to the provisions of Okla. Const., art. 10, § 26, and any apportionments from ad valorem tax levies may not be used to pay for long-term debts which have not been certified and approved under the provisions of art. 10, § 26.

### I. THE FACTS

This controversy arises out of the refusal of the Muskogee County Excise Board to apportion ad valorem tax revenues to the City of Muskogee for payment of a thirty year bond debt of the Muskogee Urban Renewal Authority. The constitutional challenges were submitted to the district court on stipulated facts. In the early 1970's, the Muskogee Urban Renewal Authority was formed; a part of the inner city of Muskogee was determined to be blighted; and an urban renewal plan was approved for the urban renewal area.[1] The eleven-story Severs Hotel is located within the urban renewal area.

---

1. Section 1602, et seq. of Title 11 of the Oklahoma Statutes, now codified at 11 O.S.1991, §§ 38–101, et. seq. authorizes urban renewal. See, *Muskogee Urban Renewal Authority v. Garrett,* 821 P.2d 1067 (Okla.App.1989).

On June 8, 1987, the urban renewal plan was amended to provide an urban renewal project for the rehabilitation of the Severs Hotel building and clearance and demolition of surrounding property.

On June 26, 1987, the City Council of the City of Muskogee approved a resolution declaring Lots 51 through 60 and Lots 21 through 30 of the Severs Subdivision of Block 10 and Wall Street between State and 5th Streets and 5th Street between Broadway and Court Streets (the Severs Hotel project) to be a "tax increment allocation district"[2] and providing that "any ad valorem tax millage authorized by law shall be appropriated to the City of Muskogee for use by the City of Muskogee or the Urban Renewal Authority" to fund the Severs Hotel project.[3]

On July 21, 1987, the City of Muskogee, the Muskogee Urban Renewal Authority, the First National Bank and Trust Co. of Muskogee, and two developers, H. and M. Investments, an Oklahoma limited partnership of Tulsa, Oklahoma, and the Johnson Company of Tulsa, Oklahoma, entered into an agreement for the redevelopment of the Severs Hotel building and surrounding property "for the First National Bank and Trust Co. of Muskogee and other office facilities of approximately 60,000 square feet costing approximately $4,535,800.00."[4] The City of Muskogee agreed to file condemnation proceedings against the owners to assist in the acquisition of the parcel to be redeveloped; "to pay any cost above $780,000.00 for acquisition of the properties of the Owners, removal of asbestos from the Severs Hotel and any required relocation expenses(.)";[5] and to convey the property to the Muskogee Urban Renewal Authority. The City of Muskogee also agreed that the city or the Muskogee Urban Renewal Authority would remove the asbestos from the Severs Hotel building. The First National Bank agreed to make a loan to the Muskogee Urban Renewal Authority necessary to pay "any and all costs over and above the $780,000.00 incurred by the City to complete acquisition, relocation, asbestos removal and other related expenses ..." which would be repaid within the next thirty years, "in accordance with a proposed Authority Bond...."[6]

On August 26, 1987, the Muskogee Urban Renewal Authority became indebted to the First National Bank and Trust Co., Muskogee, Oklahoma, in the amount of $220,000.00 "to provide a portion of the financing for the costs of acquisition of land, relocation and removal of asbestos from the Severs Hotel ..." by the issuance of a single bond.[7] The bond provides that it is not an obligation of the City of Muskogee and that it is payable from the apportionment of millage allocated to the City and pledged to the Authority.

The City notified the county assessor's office of the designated tax increment allocation district.[8] On July 1, 1987, the Muskogee County Assessor certified the "base year net assessed valuation"[9] at $278,421.00 for the Severs Hotel project. On July 1, 1988, the assessed value of the Severs Hotel project was certified at $523,281.00. On June 8, 1989, the assessed value of the Severs Hotel project was certified at $1,491,612.00.

The City of Muskogee included the Severs Hotel project as an item in its estimate of need or budget for fiscal year 1988–1989. On October 12, 1988, the Muskogee County Excise Board refused to apportion ad valorem tax millage to the City of Muskogee for the Severs Hotel project. Again, the City of Muskogee included the Severs Hotel project

2. 11 O.S.Supp.1983, § 38–120.

3. R. at page 6, RESOLUTION NO. 1517.

4. R. at page 10, Third Amended Economic Redevelopment Agreement for the rehabilitation of the Severs Hotel building and the clearance and demolition of property bounded by State Street, 5th Street, Wall Street and Broadway Street in the City of Muskogee.

5. Id. at page 10.

6. Id. at page 11.

7. R. at page 8. The bond is entitled "MUSKOGEE URBAN RENEWAL AUTHORITY BOND ANTICIPATION OF TAX INCREMENT FINANCING AND REVENUE PURSUANT TO MUSKOGEE URBAN RENEWAL PLAN AMENDMENT C"

8. 11 O.S.Supp.1983, § 38–122.

9. Id.

as an item in its estimate of need for fiscal year 1989–1990. On August 8, 1989, the Muskogee County Excise Board again refused to apportion ad valorem tax millage to the City of Muskogee for the Severs Hotel project.

## II. THE PROCEEDINGS BELOW

On June 22, 1989, the Muskogee Urban Renewal Authority and the City of Muskogee filed this action for declaratory judgment and a writ of mandamus directing the Muskogee County Excise Board to apportion ad valorem tax millage to the City of Muskogee as required by 11 O.S.Supp.1983, § 38–123, for the rehabilitation and improvement of the Severs Hotel project. In defense, the Muskogee County Excise Board challenged the constitutionality of 11 O.S.Supp.1983, §§ 38–120, et seq.

The district court concluded that 11 O.S.Supp.1983, §§ 38–120, et seq., authorizing tax increment allocation districts, are not violative of the Oklahoma Constitution, art. 10, §§ 26 and 27; that 11 O.S.Supp.1983, § 38–123, directing apportionment and specifying the formula for calculating the millage to be apportioned to the city in which the tax increment allocation district is located, is not violative of the Oklahoma Constitution, art. 10, § 5; and, that 11 O.S.Supp.1983, § 38–123(4) is not an unconstitutional usurpation of the powers of a county excise board nor is it unconstitutionally vague. The district court issued a writ of mandamus directing the Muskogee County Excise Board to apportion ad valorem tax revenues to the City of Muskogee in accordance with 11 O.S.Supp.1983, §§ 38–120, et seq., and, in lieu of compliance with the writ, granted the Muskogee Urban Renewal Authority a money judgment against Muskogee County and the Muskogee County Excise Board in the amount of $45,-141.21, together with post-judgment interest and future amounts of ad valorem tax revenues required to be apportioned to the City of Muskogee for rehabilitation and improvement of the Severs Hotel Building pursuant to 11 O.S.Supp.1983, § 38–123. The Musko-

gee County Excise Board appealed the district court judgment.

## III. TAX INCREMENT FINANCING

■ Tax increment financing of the costs of urban renewal was enacted in 1983.[10] Tax increment financing is a statutory mechanism whereby municipalities may dedicate future ad valorem tax revenues for the payment of the costs of undertaking and carrying out urban renewal and urban redevelopment projects. Summarizing the 1983 legislation:

Section 1 amended 11 O.S.1981, § 24–108, which authorizes the Oklahoma Municipal Power Authority to issue bonds, and is not germane to the issues herein.

Section 2 amended 11 O.S.1981, § 38–115, which authorizes an Urban Renewal Authority to issue bonds, leaving intact the provision that notes and bonds of an urban renewal authority are not debts of the state or municipality. The amendment to § 38–115 allows payment of the principal and interest of urban renewal authority bonds from "taxes on incremental property values allocated to a special fund of the city and appropriated by the city to the Urban Renewal Authority."

Section 3, codified at § 38–120, permits the governing body of a municipality to designate an urban renewal area to be a tax increment allocation district, upon notice and public hearing and subsequent determination that the designation is necessary and desirable in achieving the objectives of one or more urban renewal or urban redevelopment projects.

Section 4, codified at § 38–121, declares that the costs of urban renewal and repayment of interest and principal on urban renewal bonds are valid and lawful objects to which ad valorem taxes authorized in art. 10, § 9(a) may be applied.

Section 5, codified at § 38–122, provides for a "base year net assessed valuation" of all real property in the tax increment allocation district. The "base year net assessed valuation" is the starting point for determining the millage to be apportioned for urban renewal.

10. 1983 Okla.Sess.Laws, ch. 310. The "tax increment allocation district" financing scheme is codified at § 38–115 and §§ 38–120 through 38–

123 of Title 11. These sections remain unchanged in the 1991 recodification. All references will be to the 1991 codification.

Section 6, codified at § 38–123, requires the county excise board to apportion a part of the millage authorized by art. 10, § 9(a) to the municipality and provides the apportionment formula to be followed by the county excise board. The apportionment formula arrives at a millage rate for each year which is proportionate to the increased value of the urban renewal property, the increment, divided by the total assessed value of property in the city, to a maximum of one-half a mill. The county excise board is required to apportion the millage and revenues therefrom to the city for urban renewal and urban renewal redevelopment in accordance with § 2495 of Title 68, for a maximum of thirty years.

Facially, the 1983 legislation establishes a scheme for a municipality to fund the renewal or redevelopment efforts of its urban renewal authority through various means. In relation to the instant case, the legislation authorizes the following: a municipality may create an urban renewal authority;[11] the urban renewal authority is considered an instrumentality of the municipality;[12] the urban renewal authority may incur debt to fund urban renewal by issuing notes or bonds;[13] the note or bond is considered a debt of the urban renewal authority and not of the municipality;[14] the municipality may include the urban renewal authority's debt in its annual estimate of need or budget;[15] the county

excise board must apportion to the municipality those revenues generated by the millage determined in accordance with the statutory formula and levied upon all the property in the municipality;[16] and, the municipality may allocate the ad valorem tax revenues to the urban renewal authority to fund urban renewal including the payment of interest and principal due on the urban renewal authority's note or bond.[17]

## IV.   11 O.S.1991, § 38–123

The validity of § 38–123 is the center of this controversy. Section 38–123 is the substance of tax increment financing. Section 38–123 provides:

For every year in which tax increment allocations are used by a city or an Urban Renewal Authority, the county excise board shall apportion to the city in which such tax increment allocation district is located, a part of the millage authorized by subsection (a) of Section 9 of Article X of the Oklahoma Constitution. The procedure for apportioning such millage shall be as follows:

1.  Upon notice of such use by the city, the county assessor shall reassess the amount of increase from the base year net assessed valuation of real property within a tax increment allocation district and shall certify such amount to the county clerk

---

11.  11 O.S.1991, § 38–101, et seq.

12.  11 O.S.1991, § 38–107.

13.  11 O.S.1991, § 38–115. An urban renewal authority does not have the power to issue general obligation bonds. 11 O.S.1991, § 38–108(B)(5).

14.  11 O.S.1991, § 38–115(B).

15.  68 O.S.1981, § 2483, now codified at 68 O.S. 1991, § 3002. An urban renewal authority is not a taxing entity for purposes of apportionment of ad valorem tax millage. It has no legislative power to levy or assess taxes or fees nor to appropriate public money. 11 O.S.1991, § 38–108(B)(6).

16.  In the annual budget process for the various ad valorem taxing entities, the county excise board functions to approve estimated needs for the next fiscal year for each ad valorem taxing entity in the county and to levy the ad valorem

tax millage to meet the approved needs. The county excise board determines the total assessed valuation of taxable property in each taxing jurisdiction; then, the county excise board computes the levy or millage which will raise an amount of money to meet the approved need of each of the several funds of the taxing jurisdictions, including the municipality's general fund, special funds and sinking funds. 68 O.S.Supp.1987, § 2497, now codified at 68 O.S.1991, § 3017. The total millage levy to meet the general and special operating needs of the county and its municipalities, other than sinking funds, is limited to ten mills. Okla. Const., art. 10, § 9(a). Sinking funds are created for the retirement of long-term debts and judgments; and millage levies to meet county and municipal sinking fund needs are in addition to the ten mill limitation. Okla. Const., art. 10, § 28.

17.  11 O.S.1991, § 38–115 provides for allocation of the revenues to the municipality's special urban renewal fund by the county excise board and appropriation by the municipality "to the Urban Renewal Authority...."

and the county excise board before July 1 of each year. Such amount, to the extent not already included, shall be added to the net assessed valuation of the tax increment allocation district and the total shall be referred to as the current year net assessed valuation;

2. The county excise board shall then determine the amount to be apportioned. The procedure for determining such amount shall be as follows:

    a. compute the revenue derived from the tax increment allocation district's base year net assessed valuation by multiplying the total millage levied during the prior year against the base year net assessed valuation of the tax increment allocation district,

    b. compute the revenue derived from the tax increment allocation district's current year net assessed valuation by multiplying the total millage levied during the prior year against the current year net assessed valuation of the tax increment allocation district,

    c. compute the incremental tax revenue of the tax increment allocation district subtracting the revenue derived from the base year net assessed valuation from the revenue derived from the current year net assessed valuation, and

    d. divide the incremental tax revenue by the current year net assessed valuation of the city in which the tax increment allocation district is located.

The result represents the amount of the millage to be apportioned by the county excise board to the city in which the tax increment allocation district is located;

3. The county excise board shall then apportion such amount to the city, for use for urban renewal and urban development purposes, in accordance with Section 2495 of Title 68 of the Oklahoma Statutes, provided that in no event shall the apportionment authorized by this section exceed one-half (½) mill; and

4. Such allocations with respect to a tax increment allocation district shall terminate upon the expiration of thirty (30) years or such earlier date as may be determined by the municipality.

■ The Muskogee County Excise Board asserts that § 38–123 is unconstitutional. Cognizant of the presumption that § 38–123 is constitutional,[18] we consider the arguments of the Muskogee Urban Renewal Authority and the City of Muskogee in support of § 38–123 and the tax increment financing scheme.

■ The thrust of § 38–123 is to require apportionment of a portion of the ten mills authorized in art. 10, § 9(a) to assist in retiring a long-term debt of an municipality's urban renewal authority.[19] The City and its urban renewal authority argue that art. 10, § 9 authorizes the Legislature to change the method of apportionment, thus, the appropriation of revenues in 11 O.S.Supp.1983, § 38–123 does not usurp the power of the county excise board nor does it violate art. 10, § 5. Article 10, § 9(a) expressly permits the Legislature to mandate apportionment of the ten (10) mills among the taxing entities.[20] Article 10, § 9(a) does not restrict a legislative apportionment.[21] On its face, the mandatory

---

18. *Draper v. State*, 621 P.2d 1142 (Okla.1980).

19. As discussed earlier, ad valorem tax revenues needed to retire long-term indebtedness are paid out of sinking funds which do not cut into the ten mills available to pay the annual costs of governmental operations of the local taxing entities. Okla. Const., art. 10, § 28. We do not consider whether art. 10, § 28 prohibits the Legislature from apportioning the ten mills in art. 10, § 9(a) for the purpose of retiring long-term debts, as neither party makes that argument.

20. The Oklahoma Constitution, art. 10, § 9(a) provides:
    (a) Except as herein otherwise provided, the total taxes for all purposes on an ad valorem

basis shall not exceed, in any taxable year, fifteen (15) mills on the dollar, no less than five (5) mills of which is hereby apportioned for school district purposes, the remainder to be apportioned between county, city, town and school district by the County Excise Board, until such time as a regular apportionment thereof is otherwise provided for by the Legislature.

21. In ascertaining the constitutionality of a legislative act, we do not look to the constitution to determine whether the legislature is authorized to do an act, but whether the legislature is prohibited from doing an act. *Reherman v. Oklahoma Resources Bd.*, 679 P.2d 1296 (Okla.1984).

apportionment in § 38–123 is not an unconstitutional usurpation of the powers vested in the county excise boards by art. 10, § 9(a).[22] Further, § 38–123 recognizes the power of a municipality to levy, appropriate and expend ad valorem tax revenue for urban renewal purposes.[23] A reading of § 38–123 reveals no legislative intent to surrender, suspend or contract away the power of taxation, nor to tax some but not all property in the taxing jurisdiction.[24] On its face, § 38–123 does not contravene art. 10, § 5.

■ The City of Muskogee and its urban renewal authority sought revenues from the millage calculated under § 38–123 and levied upon the assessed value of taxable property in the County of Muskogee. They assert that the power to apportion millage includes the power to apportion revenues from the county-wide millage levy among the county and the municipalities in accordance with the needs of each. This argument is without merit. It is elementary that the City of Muskogee is not entitled to revenues generated by a tax levied outside the city's territorial boundaries.[25] The duties of the Muskogee County Excise Board to calculate and apportion the millage to be levied on behalf of the City of Muskogee does not extend the city's taxation boundaries to include county-wide taxable property.[26] Mandatory apportionment to a city of revenues generated by a

**22.** We recognize that the functions of the county excise board in approving estimated needs and apportioning tax millage are discretionary. *Summey v. Tisdale,* 658 P.2d 464 (Okla.1982). The constitution reserves to the Legislature the power to dictate apportionment, hence § 38–123 cannot be viewed as a usurpation of a discretionary function constitutionally vested in the county excise boards.

**23.** The Muskogee County Excise Board does not challenge the public purpose of urban renewal. Years before the challenged legislation was enacted, the Legislature declared that urban renewal constitutes a public purpose "for which public money may be expended" and authorized municipalities to "[a]ppropriate funds for urban renewal purposes." 11 O.S.1981, §§ 38–102 and 38–109, which remain unchanged in the 1991 recodification, first enacted in 1959 Okla.Sess.Laws, pp. 63 and 68, §§ 4 and 11. These declarations comport with the public purpose requirement of Okla. Const., art. 10, § 14.

**24.** The Oklahoma Constitution, art. 10, § 5 provides:

The power of taxation shall never be surrendered, suspended, or contracted away. Taxes shall be uniform upon the same class of subjects.

**25.** *State ex rel. Cartwright v. Oklahoma Tax Commission,* 653 P.2d 1230, 1235 (Okla.1982).

**26.** The Muskogee County Excise Board argues that § 38–123 requires disparate apportionment of county tax millage to a city contrary to art. 10, § 5. It is not the statute that requires apportionment of county-wide revenues to a city, but that is the application ordered by the district court. The district court judgment includes an attached calculation of the revenues which the City and the Authority claim they are entitled to from the 1988 and 1989 millage apportionment calculated under 11 O.S.Supp.1983, § 38–123. The record does not indicate the source of the calculation attached to the judgment. We assume it was provided by the City or the Authority. The attached calculation is based on county-wide levies. The attachment provides:

Millage to be apportioned by the county excise board:

262,418,840 (1988 N.A.V. County) × .03 mills = $7,872.56.
. .

Millage to be apportioned by the county excise board:

266,204,580 (1989 N.A.V. County) × .14 mills = $37,268.64
TOTAL TO BE APPORTIONED FOR YEARS 1988 AND 1989:

|      |                |
|------|----------------|
| 1988 | $ 7,872.57     |
| 1989 | × 37,268.64    |

GRAND TOTAL        $45,141.21

The judgment entered in favor of the Muskogee Urban Renewal Authority is in the amount of $45,141.21 for 1988 and 1989 ad valorem tax revenues. The $45,141.21 amount represents the ad valorem tax that would have been generated by levies of the calculated millage rates upon the **1988 and 1989 N.A.V. (net assessed valuation) for the county.**

The dissent's finding that the bond will be paid from revenues "taken from those who directly benefitted" is erroneous, unless we presume that all ad valorem taxpayers in the entire county benefits from the rehabilitation of the Severs Hotel. Further, affirmance of the district court money judgment in favor of the Authority is tantamount to a grant of relief to the bondholder, Intervenor, First National Bank of Muskogee,

county-wide levy cannot be gleaned from the face of § 38–123. The district court's application of § 38–123 is in error.

■ The City and its urban renewal authority argue that § 38–123 is in harmony with the Okla. Const., art. 10, § 26 because the indebtedness is not a debt of the city under 11 O.S.1981, § 38–115 and the urban renewal authority is authorized to receive public funds under 11 O.S.1981, § 38–109 and 11 O.S.Supp.1983, § 38–121. Further, they argue that there can be no violation of art. 10, § 26 because the tax revenues apportioned to the city for urban renewal pursuant to § 38–123 are generated by the urban renewal project.

Article 10, § 26, provides in pertinent part: [27]

Except as herein otherwise provided, no county, **city,** town, township, school district, or other political corporation, or subdivision of the state, **shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters** thereof, voting at an election, to be held for that purpose, nor, in cases requiring such assent, shall any indebtedness be allowed to be incurred to an amount, including existing indebtedness, in the aggregate exceeding five percent (5%) of the valuation of the taxable property therein, to be ascertained from the last assessment for state and county purposes previous to the incurring of such indebtedness: ... Provided further, that if a city or town has an absolute need therefor, such city or town may, with the assent of three-fifths of the voters thereof voting at an election to be held for that purpose,

incur indebtedness to an amount, including existing indebtedness, in the aggregate exceeding five percent (5%) but not exceeding ten percent (10%) of the valuation of the taxable property therein, to be ascertained from the last assessment for state and county purposes previous to the incurring of such indebtedness and such assent to such indebtedness shall be deemed to be a sufficient showing of such absolute need unless otherwise provided by law. Provided, further, that any county, city, town, school district, or other political corporation, or subdivision of the state, incurring any indebtedness requiring the assent of the voters as aforesaid, **shall, before or at the time of doing so, provide for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also to constitute a sinking fund for the payment of the principal thereof within twenty-five (25) years from the time of contracting the same....**

[Emphasis added.]

■ It is our duty to read and interpret § 38–123 in harmony with art. 10, § 26, if possible.[28] On its face, § 38–123 does not violate art. 10, § 26. But, § 38–123 is vital to and the substance of the tax increment financing scheme. Without § 38–123, "tax increment allocation district," "base year net assessed valuation," and "taxes on incremental property values" are rendered useless. We must read § 38–123 in light of the other statutes amended or enacted in the same measure.[29] In the context of the whole statutory tax increment financing scheme, § 38–123 does not in and of itself violate art. 10, § 26. There is nothing unconstitutional with allowing municipalities to utilize apportion-

even though the dissent finds that the bondholder has no recourse against the city or the authority.

**27.** Article 10, § 26 was amended by State Question No. 648, Legislative Referendum No. 292, adopted at the general election held November 3, 1992. All the language of § 26, as last amended by State Question No. 489, Legislative Referendum No. 195, adopted August 22, 1972, remains unchanged in what is now subsection (a). The 1992 amendment added two new paragraphs: subsection (b) provides for the adjustment of the percentage limitations on indebtedness in sub-

section (a) in the event a county exempts household goods and livestock from ad valorem taxation; and, subsection (c) declares the amendment effective January 1, 1993.

**28.** *City of Oklahoma City v. Oklahoma Tax Commission,* 789 P.2d 1287, 1292 (Okla.1990).

**29.** 1983 Okla.Sess.Laws, ch. 310. *Richards v. U.S.,* 369 U.S. 1, 5–8, 82 S.Ct. 585, 589–90, 7 L.Ed.2d 492 (1962); and, *City of Midwest City v. Harris,* 561 P.2d 1357 (Okla.1977).

ments made pursuant to § 38–123 to retire long-term debts. However, such apportionments remain subject to the requirements of Okla. Const., art. 10, § 26, as will be explained.

In prohibitive terms, art. 10, § 26[30] prescribes the manner in which the political subdivisions of this State may voluntarily incur debts that cannot be paid during the fiscal year incurred: 1) the debt must be certified as being within the political subdivision's debt limit; 2) the annual tax to be levied and placed in a sinking fund to pay the interest and principal must be proposed or identified to the voters before or at the time of the election; and, 3) the debt must be authorized by the voters of the political subdivision.[31] The manner in which a political subdivision may incur debts, that is, the debt limitations, in art. 10, § 26 is clear and without reservation or exception.[32]

■ In art. 10, § 26, the people reserve to themselves the right to approve any and all debts that will be paid with taxes levied and collected in subsequent fiscal years, which includes the right to approve the tax to be levied in subsequent years.[33] Unless a debt is incurred within the confines of art. 10, § 26, ad valorem tax millage cannot be levied and apportioned for payment of the debt. That is, the specific debt limitations of art. 10, § 26 not only prohibit the creation of long-term indebtedness without assent of the voters, but also proscribe the raising and spending of ad valorem tax revenues for the payment of debts other than those incurred in compliance with its provisions. A long-term debt of an urban renewal authority that

has not been presented to and approved by the voters as prescribed by art. 10, § 26 cannot be the lawful object of a legislative apportionment of ad valorem tax revenues.

The Legislature must abide by the prohibitive commands of art. 10, § 26. The Legislature cannot direct apportionment of ad valorem tax revenues for payment of a long-term debt for urban renewal, if the voters have not approved the debt. Therefore, the directive of the Legislature for a county excise board to apportion under § 38–123 must be subject to the strictures of art. 10, § 26. Any apportionments made pursuant to § 38–123 may be used by a municipality to augment principal and interest payments made on legal debts.[34]

■ The question then arises whether City has become indebted in violation of art. 10, § 26. First, we do not agree with the City of Muskogee and the Muskogee Urban Renewal Authority that under the tax increment financing statutes a debt of an urban renewal authority is not a debt of the municipality. See, 11 O.S.Supp.1983, § 38–115. The facts in this case illustrate that the urban renewal debt to be financed through the statutory tax increment financing scheme is a debt of the municipality.[35] No proclamation, by statute or otherwise, alters the nature of the bond as an indebtedness of the City of Muskogee. This is so because, by separate contract the City *promises* the holder of the bond that it will pay the costs of the rehabilitation project for the Severs Hotel.[36] The City's agreement to pay satisfies the

---

30. Now, art. 10, § 26(a). See, footnote 27.

31. *City of Lawton v. Morford*, 146 Okla. 222, 293 P. 1068 (1930).

32. Nothing in art. 10, § 26 implicitly reserves to the Legislature the power to authorize municipalities to pay debts other than those incurred in accordance with the requirements of art. 10, § 26.

33. *Willow Wind, Inc. v. City of Midwest City*, 790 P.2d 1067, 1070 (Okla.1989).

34. A long-term debt of a political subdivision must be retired from funds apportioned and ap-

propriated to sinking fund for that purpose. Okla. Const., art. 10, §§ 19, 26 and 28. Tax increment apportionments may be added to the funds appropriated to this sinking fund to assist in the retirement of the debt.

35. When a municipality promises to pay a certain amount within a specified time out of its tax collections, it creates a debt. *Willow Wind, Inc. v. Midwest City*, 790 P.2d 1067, 1070 (Okla. 1989).

36. The City contracted with First National Bank of Muskogee "to pay any cost above $780,000.00 for acquisition of the properties of the Owners, removal of asbestos from the Severs Hotel and any relocation expenses."

bond holder that tax revenue will be allocated to retire the bond.[37]

Consequently, despite the § 38–115(B) provision that bonds issued under the legislation shall not constitute an indebtedness of a municipality, the bond at issue is an indebtedness of City. However, under the facts before us, we are unable to resolve the issue of whether this indebtedness of City violates art. 10, § 26.

The City and its urban renewal authority argue their indebtedness did not violate art. 10, § 26, because at the time the bond was issued, sufficient income and revenue was appropriated and budgeted for the year. For support, they point to Resolution No. 1514 of the City Council of the City of Muskogee and Amendment C of the Urban Renewal Plan. Resolution No. 1514 declares the relevant property a blighted area and adopts Amendment C into the previously-approved Urban Renewal Plan. Amendment C outlines the plan proposed to renew the blighted area around and including the Severs Hotel. It contains a section entitled Project Financing which discusses the agreement between City and private developers to begin renewal. It then states as follows:

"The proposed method of public financing may be as follows:

1. Tax increment financing: upon the establishment of a tax increment financing district for the project area or any part, it is estimated that an increased value of properties should yield additional ad valorem taxes available to the City of Muskogee subsequent to the planned improvements of the private redevelopers pursuant to 11 O.S. Sec. 38–120 through Sec. 38–123.

2. Any private source, contribution or other financial assistance;

3. Any other monies derived from gifts, grants, the sale of properties or any other legally available source;

4. The proceeds from additional borrowings;

5. Any proceeds from the general fund of the City of Muskogee as appropriated by the City Council to the Muskogee Urban Renewal Authority to retire any notes or bonds of the Authority; an action is pending in the district court of Muskogee County seeking damages against the current owner of Lots 21 through 30 and Lots 51 through 60 in the Severs Subdivision of Block 10, City of Muskogee and declaratory relief entitling the City of Muskogee to spend up to $485,500 towards rehabilitating the Severs Hotel. The current owner had entered into an agreement dated August 24, 1983 with the City of Muskogee which provides that the City may '(a) Recover an amount equal to all costs and expenses incurred (including federal U.D.A.G. grant funds expended) by First Party (City) for the construction of Second Party's (current owner) Project in the downtown business district of Muskogee, Oklahoma, plus reasonable attorneys fee and court costs, all as liquidated damages for such default, and not as a penalty or forfeiture ...'

6. Any proceeds raised by levying ad valorem any condemnation judgment against properties within the City of Muskogee through the sinking fund should other funding be inadequate to pay any judgments in condemnation and said levy be allowed.

7. Any combination of the above."

The City and its authority claim they were not dependent upon Bank to buy the bond in order to fund the project. Rather, they consider the bond as an extra source of funding. Further arguing the income and revenue from the sources listed in Amendment C above are sufficient to pay for the bond, they urge this Court to affirm the district court judgment. These additional facts and argument raise an issue appropriate only for the trier of facts. The matter must be remanded to the district court for a determination of whether the City has become indebted in an amount exceeding "the income and revenue provided for such year" without first receiving the assent of three-fifths of the voters of the City and passing a tax for the establish-

---

**37.** The express purpose of the $220,000.00 bond debt incurred by the Muskogee Urban Renewal Authority is the payment of the same costs of the rehabilitation project for the Severs Hotel above $780,000.00.

ment of a sinking fund. Okla. Const. art. 10, § 26.

## V. CONCLUSION

The legislation authorizing tax increment financing is constitutional on its face. It does not usurp the power of the county excise board, Okla. Const., art. 10, § 9(a), nor is it a legislative attempt to surrender, suspend or contract away the power to tax, Okla. Const., art. 10, § 5. Moreover, the statute mandated apportionment by the county excise board, 11 O.S.Supp.1983, § 38–123, does not violate Okla. Const., art. 10, § 26, because it does not authorize a municipality to become indebted to an amount exceeding the income and revenues for that year without certification and approval under art. 10, § 26. In other words, the provisions of § 38–123 are subject to art. 10, § 26. Regardless of the characterization given debts of an urban renewal authority of a municipality by 11 O.S.Supp.1983, § 38–115(B), if the municipality is obligated to pay a certain amount over a year or more to retire the debt of its urban renewal authority, the municipality is indebted. If a municipality becomes indebted pursuant to the tax increment financing legislation, such indebtedness must not violate the strictures of art. 10, § 26.

In the case at bar, it is difficult to determine whether the indebtedness of the City of Muskogee violates art. 10, § 26, because the issue of whether the City has become indebted to an amount in excess of the income and revenue for that year remains to be answered. Therefore, we must remand this case for further proceedings consistent with this opinion.

**TRIAL COURT WRIT OF MANDAMUS DISSOLVED; TRIAL COURT JUDGMENT REVERSED AND REMANDED.**

ALMA WILSON, C.J., KAUGER, V.C.J., and LAVENDER, SIMMS, HARGRAVE and WATT, JJ., concur.

HODGES and OPALA, JJ., dissent.

SUMMERS, J., not participating.