2000 OK 23

**OKLAHOMA CITY URBAN RENEWAL AUTHORITY, a public body corporate, Appellee,**

v.

**MEDICAL TECHNOLOGY AND RESEARCH AUTHORITY OF OKLAHOMA, a statutory agency of the State of Oklahoma, Defendant,**

Forrest "Butch" Freeman, Oklahoma County Treasurer, Appellant,

The City of Oklahoma City, a political subdivision of the State of Oklahoma; Independent School District No. 89; Vo-Tech School District No. 22; Metropolitan Library System of Oklahoma County; City–County Health Department of Oklahoma County, Defendants,

Board of Commissioners of Oklahoma County, Appellant.

Nos. 93,084, 93,085.

Supreme Court of Oklahoma.

April 4, 2000.

Rehearing Denied July 10, 2000.

Dan Batchelor, Janis S. Powers, Oklahoma City, for Appellee, Oklahoma City, Oklahoma, Urban Renewal Authority.

Richard D. Forshee, John Michael Williams For Defendant, Medical Technology and Research Authority of Oklahoma.

Robert M. Macy, District Attorney, Gretchen Crawford, Assistant District Attorney, Oklahoma City, Oklahoma, for Appellants, Forrest "Butch" Freeman, Oklahoma County Treasurer and Board of County Commissioners of Oklahoma County.

Daniel T. Brummitt, Assistant Municipal Counselor for Defendant, City of Oklahoma City.

William P. Bleakley, Laura L. Holmes, Oklahoma City, Oklahoma, for Defendant, Independent School District No. 89.

1. Title 62 O.S. Supp.1997 § 861 provides in pertinent part:

"A. A project plan may contain a provision that the increments from certain local taxes or fees may be used to finance project costs in areas qualified under this act. The increment from local taxes or fees levied from and after the effective date of the approval of such plan shall be apportioned in the following manner for a period not to exceed twenty-five (25) years or the period required for payment of project costs, whichever is less:

1. That portion of the ad valorem taxes which are produced by the levy at the rate fixed each year by or for each such ad valorem taxing entity upon the base assessed value of the increment district determined pursuant to Section 13 of this act and as to an area later added to the increment district, the effective date of the addition to the increment district, shall be paid to each taxing entity and all or any portion of local sales taxes, other local taxes or local fees collected each year which are not subject to apportionment shall be paid or retained as otherwise provided by law; and

2. That portion of ad valorem taxes, in excess of such amount specified in paragraph 1 of this subsection, and all or any portion of the increment of local sales taxes, other local taxes or local fees, or a combination thereof, paid to or for the benefit of the city, town, or county approving the plan, and with its consent, evidenced by agreement in writing, all or any portion of the increment of local sales tax, other local taxes or local fees, or combination thereof, payable to any other local public entity, shall be apportioned to, and when collected, shall be paid into an apportionment fund established for the project pursuant to the project plan to be used for the payment of the project costs and for the payment of the principal of, the interest on, and any premiums due in connection with the bonds of [sic], loans, notes, or advances of money to, or indebtedness incurred to finance project costs, whether funded, refunded, assumed, or otherwise, for financing, in whole or in part, eligible project costs. Nothing shall prohibit the increments from being used to directly pay eligible project costs. When all eligible project costs and such bonds, loans, advances of money or indebtedness, if any, including interest thereon and any premiums due in connection with them, have been paid and the governing body adopts an ordinance or resolution dissolving the tax ap-

**KAUGER, J.:**

¶ 1 The dispositive issue presented by the consolidated cases is whether the tax increment financing [1] plan adopted under the Local Development Act [Act], 62 O.S. Supp.1992 § 850, et seq., and the Okla. Const. art. 10, § 6C [2] creates a prohibited debt within the portionment financing, all ad valorem taxes upon the taxable property within the boundary of such district shall be paid into the funds of the respective taxing entities....

C. To the extent that collections exceed project costs and the provisions for payment of principal and interest along with sufficient reserves on any bonds issued pursuant to the provisions of Section 863 of this act, the excess shall be paid into the funds of the respective taxing entities unless the taxing entity agrees to some other use of such collections.

D. Except as provided in subsection E of this section, for any year in which taxes or fees are apportioned in the manner specified in paragraph 2 of subsection A of this section, any increase in assessed valuation of taxable real property within the boundaries of such district in excess of the base assessed value shall not be considered by any taxing entity in computing any debt limitation or for any other purpose except for the levy of taxes and in determining the amount to be apportioned.

E. In the event there is a general reassessment of ad valorem tax property valuations of any property within the boundaries of an increment district, the portions of valuations for assessment pursuant to paragraphs 1 and 2 of subsection A of this section shall be proportionately adjusted in accordance with such reassessment...."

Because the present statutory scheme is identical to the 1992 version except to the extent that the section numbers are identified as sections of the statute rather than as sections of the original legislative enactment, references are to the current provisions of the statute.

2. The Okla. Const. art. 10, § 6C provides:

"A. The Legislature, by law, may grant incorporated cities, towns, or counties the ability to provide incentives, exemptions and other forms of relief from taxation for historic preservation, reinvestment, or enterprise areas that are exhibiting economic stagnation or decline. Relief from taxes imposed by other local taxing jurisdictions shall only be allowed by contractual arrangement with the municipal or county governing body. The law shall require public hearings before such relief may be granted and shall provide for the local initiative power and referendum of the people. The Legislature may set limitations on the cumulative incentives and relief provided pursuant to the provisions of this section, the time period for the exemptions, the geographical area of the jurisdiction covered, the percentage of the tax base of the jurisdiction eligible for the relief pro-

meaning of the Okla. Const. art. 10, § 26.[3] We hold that it does. Our holding is consistent with *Muskogee Urban Renewal Auth. v. Excise Bd. of Muskogee County*, 1995 OK 67, ¶ 24, 899 P.2d 624 providing that although facially constitutional, the tax increment financing plan at issue—under which the city undertook the promise to pay through an independent contract—was subject to voter approval under art. 10, § 26. It also conforms with the analysis of long-term debt financing for constitutional purposes undertaken in *Matter of Oklahoma Capitol Improvement Auth.*, 1998 OK 25, ¶¶ 35–40, 958 P.2d 759.

¶ 2 Because the tax increment plan, as adopted, does not survive the initial constitutional barrier, we need not address the assertions of the Commissioners and the School District that creation of the tax increment district required permission of all taxing entities. Additionally, although the trial court addressed the public purpose requirements of the Okla. Const. art. 10, § 14 and the surrender of taxing powers under art. 10, § 5, the parties have not asserted either of these constitutional provisions as challenges to the constitutionality of the Act on appeal. We limit our holding to the issues addressed herein. The particular set of facts of future litigation, or questions premised upon other constitutional provisions or issues of statutory construction may demonstrate problems not addressed here.

grams, and threshold limits of investment credit and jobs created.
B. The Legislature, by law, may authorize that the cities, towns, or counties may specifically use local taxes and local fees, in whole or in part, for specific public investments, assistance in development financing, or as a specific revenue source for other public entities in the area in which the improvements take place and may direct the apportionment of the taxes and fees specified in this subsection for the purposes specified in this section. The Legislature may establish for this subsection, the same procedures and limitations authorized in subsection A of this section.
C. The Legislature, by law, may authorize any city, town, or county to plan, finance and carry out the development or redevelopment of areas determined by the governing body of such city, town, or county to be unproductive, undeveloped, underdeveloped or blighted. The authority of the county shall be limited to the unincorporated areas of such county but any city, town or county may by agreement jointly

## UNDISPUTED FACTS

¶ 3 In an attempt to utilize tax increment financing, the City of Oklahoma City passed Ordinance No. 19,875 (ordinance) on January 5, 1993, approving the Oklahoma Health Center Economic Development Project Plan (project plan). The ordinance establishes Increment District Number One (increment district) to aid in the development of a biomedical and technological research and development park. Section 9 of the ordinance provides:

"The increment of ad valorem taxes, as defined by the Local Development Act, Title 62 Oklahoma Statutes Supplement 1992, Section 851, *et seq.*, from the Increment District Number One, City of Oklahoma City, in excess of ad valorem taxes generated by the base assessed value of the increment district, as most recently determined by the County Assessor prior to the adoption date of this ordinance, shall be apportioned and used to pay project costs authorized pursuant to Section VIII of the Project Plan for a period not to exceed 25 years from the effective date of the approval of the Project Plan, or the period required for the payment of the project costs authorized pursuant to Section VIII of the Project Plan, whichever is less."

plan, finance or carry out a development plan with any other public or private entity for one or more development projects within their respective boundaries.
D. Any city, town, or county may exercise the provisions of this section separately or in combination with powers granted by any other laws of this state."

3. The Okla. Const. art. 10, § 26 provides in pertinent part:
"(a) Except as herein otherwise provided, no county, city, town, township, school district, or other political corporation, or subdivision of the state, shall be allowed to become indebted, in any manner, or for any purpose, to an amount exceeding, in any year, the income and revenue provided for such year without the assent of three-fifths of the voters thereof, voting at an election, to be held for that purpose, nor, in cases requiring such assent, shall any indebtedness be allowed to be incurred to an amount, including existing indebtedness, in the aggregate exceeding five percent (5%) of the valuation of the taxable property therein ..."

One objective of the increment district is to finance parking facilities for the Oklahoma Health Center. It is also intended to stimulate $200 million in new investment and 2,000 new jobs through the expansion of the Oklahoma Health Center.

¶ 4 The ordinance designates the appellee, Oklahoma City Urban Renewal Authority [Urban Renewal Authority], to administer the project plan, and it authorizes the defendant, Medical Technology and Research Authority [Medical Authority],[4] to carry out certain provisions of the project plan under development agreements with the Urban Renewal Authority. Additionally, the ordinance established an *ad valorem* tax apportionment fund declaring its contents to be funds of the Medical Authority. The ordinance authorized the Medical Authority to administer the tax apportionment fund, to issue tax apportionment bonds or notes, and to incur project costs under development agreements with the Urban Renewal Authority.

¶ 5 Pursuant to the ordinance and 62 O.S. Supp.1997 § 862(A),[5] a base assessed value was established by determining the aggregate value of all the taxable property located within the boundaries of the increment district as of January 1, 1992. According to the project plan, any increments over the base assessed value are escrowed by appellant, Oklahoma County Treasurer Forrest "Butch" Freeman [Treasurer], and deposited in an apportionment fund for a period of twenty-five years or until the project costs are paid, whichever occurs first. The Treasurer established a separate, segregated fund into which *ad valorem* tax revenue from the increment district has been deposited. As of September 8, 1997, the apportionment fund contained $131,018.06.

¶ 6 On December 12, 1996, the Urban Renewal Authority made demand on the Treasurer to release the apportioned *ad valorem* tax revenues to the Medical Authority. On advice of the District Attorney of Oklahoma County, the Treasurer refused to release the tax increment until the validity of the Act and the Okla. Const. art. 10, § 6C could be litigated. The declaratory judgment action[6] was filed on September 10, 1997.[7] After consideration of the Urban Renewal Authority's motion for summary judgment and corresponding cross-motions, the trial judge found that: 1) the financing scheme served the public purpose requirements of the Okla. Const. art. 10, § 14; 2) no violation of the debt limitations contained in art. 10, § 26 existed; 3) the Act did not require written or formal consent from the School District or the Commissioners before formation of the tax increment district; and 4) creation of a tax increment district did not result in a surrender of the taxing power under art. 10,

---

4. Title 74 O.S.1991 § 7050 provides:

"In order to promote medical technology and research for the benefit of the State of Oklahoma and its citizens, there is hereby created the 'Medical Technology and Research Authority of Oklahoma', which Authority is hereby authorized and empowered to construct, maintain, repair and operate improvement projects within the State of Oklahoma as shall be approved by the Authority and to issue the improvement revenue bonds of the Authority payable solely from revenues to pay the cost of such projects, and additionally may, by means of agreement with service recipients provide operational services."

Title 74 O.S.1991 § 7051 provides:

"Improvement revenue bonds issued under the provisions of this act shall not at any time be deemed to constitute a debt of the state or of any political subdivision thereof or a pledge of the faith and credit of the state or of any such political subdivision, but such bonds shall be payable solely from the funds therein provided therefor from revenues. Such improvement revenue bonds shall contain on the face thereof a statement to the effect that neither the state nor the Authority shall be obligated to pay the same or the interest thereon except from the revenues of the project or projects for which they are issued and that neither the faith and credit nor the taxing power of the state or any political subdivision thereof if [sic] pledged, or may hereafter be pledged, to the payment of the principal of or the interest on such bonds."

5. Title 62 O.S. Supp.1997 § 862(A) provides:

"Upon approval of a plan containing apportionment financing as provided in Section 861 of this title, the county assessor shall, within ninety (90) days, determine the total assessed value of all taxable real property and all taxable personal property within the boundaries of an increment district which shall be certified by the assessor as the 'base assessed value'."

6. Title 12 O.S.1991 § 1651.

7. The following day, a second cause concerning the validity of the increment district was filed. The two causes have been consolidated on appeal by order of the Court.

§ 5. We retained the cause on June 30, 1999. The court ordered briefing cycle was completed on November 22, 1999. Finding that notice had not been given to the Attorney General pursuant to 12 O.S.1991 § 1653,[8] the Court issued an order on January 31, 2000, granting the Attorney General an opportunity to file a brief in the cause. The Attorney General responded on February 8, 2000, indicating that he was a disinterested party and would not be filing a brief in the cause.

¶ 7 THE NATURE OF TAX INCREMENT FINANCING UTILIZING *AD VALOREM* TAX REVENUES

¶ 8 On November 6, 1990, Oklahoma voters adopted art. 10, § 6C of the Oklahoma Constitution giving the Legislature the authority to grant cities, towns or counties the ability to provide incentives, exemptions or other tax relief for historic preservation, reinvestment or enterprise areas exhibiting economic stagnation or decline. Two years later, the Legislature adopted implementing legislation[9] — the Local Development Act [Act], 62 O.S. Supp.1992 § 850, *et seq.* The Act provides for tax increment financing—a mechanism whereby increments from certain local taxes or fees are dedicated to finance project costs of approved project plans.[10]

¶ 9 The cause involves the Act's treatment of *ad valorem* taxes in a tax increment financing plan. The objective is to use increased *ad valorem* tax revenue generated by the development project to pay the principal and interest on tax increment bonds issued by the Medical Authority. Tax increment financing utilizing *ad valorem* taxes assumes that the assessed property value of the area will increase because of the development project[11] and that, absent the project, property values would not rise.[12] The financing plan is intended to create economically productive property where none presently exists by providing inducements for private commercial development.[13] It allows the capture of local taxes[14] generated by a new development instead of allocating the tax increments to the taxing entities.[15]

¶ 10 For the purposes of allocation of *ad valorem* taxes, the Act requires that a base assessed value be established on all taxable real property within the boundaries of an increment district.[16] The amount of *ad valo-*

8. Title 12 O.S.1991 § 1653 provides in·pertinent part:

"When a declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceeding.... In any proceeding which involves the validity of a municipal ordinance or regulation, such municipality shall be made a party, and shall be entitled to be heard, and if a statute or regulation is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the proceeding and be entitled to be heard."

9. Title 62 O.S. Supp.1992 § 851 provides in pertinent part:

"The Local Development Act shall serve to implement and execute Section 6C of Article X of the Oklahoma Constitution as approved by the voters of the State of Oklahoma on November 6, 1990 ..."

10. Muskogee *Urban Renewal Auth.* v. *Excise Bd. of Muskogee County*, 1995 OK 67, ¶ 10, 899 P.2d 624.

11. *State ex rel. County Comm'n of Boone County, v. Cooke*, see note 43 at 483, infra; *City of Hartford v. Kirley*, 172 Wis.2d 191, 493 N.W.2d 45, 48

(1992); *Dennehy v. Department of Revenue*, see note 42 at 15, infra.

12. In re *Request for Advisory Opinion*, see note 42 at 189, infra.

13. *R.E. Short Co.* v. *City of Minneapolis*, see note 42 at 334, infra.

14. Title 62 O.S. Supp.1998 § 853(10) provides:
" 'Local taxes' means ad valorem taxes, sales taxes and other local taxes which are levied by or on the behalf of a taxing entity;"

15. Title 62 O.S. Supp.1998 § 853(17) provides:
" 'Taxing entity' means a city, town, county, school district, political subdivision or other local entity in which local taxes or fees are lived by or on its behalf."
*Brookfield Trade Ctr., Inc.* v. *County of Ramsey*, 584 N.W.2d 390, 393 (Minn.1998).

16. Title 62 O.S. Supp.1997 § 862(A) provides:
"Upon approval of a plan containing apportionment financing as provided in Section 861 of this title, the county assessor shall, within ninety (90) days, determine the total assessed value of all taxable real property and all taxable personal property within the boundaries of an increment district which shall be certified by the assessor as the 'base assessed value'."

*rem* taxes in excess of the base assessed value is the "increment" [17] paid into an apportionment fund established for the payment of the project costs—including the retirement of principal, interest or premiums due in connection with bonds, loans, notes, or other indebtedness incurred to finance projects costs.[18]

¶ 11 Under a tax increment financing plan, taxing entities are guaranteed as much tax revenue from the area as they receive in the base year. Base values are adjusted if there is a general reassessment of the area.[19] In addition, if the collections exceed project costs and other obligations, the excess is paid into the funds of the respective taxing entities.[20] Under the Act, although a general vote of the public is not required to establish a tax increment district, the Act does provide that the powers of initiative and referendum are reserved to the people of every city, town or county adopting a plan. Whenever a referendum is demanded against any measure passed by a city, town or county governing body, or whenever an initiative petition is demanded, the question is submitted to all of the registered voters of the city, town or county for approval or rejection at the next general municipal or county election.[21]

¶ 12 Simply, the tax increment equals the amount of *ad valorem* taxes collected as a result of the increase in the real property values within the project area. Tax increment financing places the cost of urban renewal on the property benefitting from the expenditure of the funds collected.[22] Once the financial obligations of tax increment financing are satisfied, it is expected that substantially increased tax revenues will be available for taxing entities within the area.[23]

I.

¶ 13 BECAUSE THE TAX INCREMENT FINANCING PLAN OBLIGATES CITY GOVERNMENT TO ALLOCATE *AD VALOREM* TAXES COLLECTED IN THE FUTURE TO RETIRE A LONG–TERM DEBT, IT IS SUBJECT TO VOTER APPROVAL UNDER THE OKLA. CONST. ART. 10, § 26.

■ ¶ 14 The Treasurer and the School District do not attack the constitutionality of tax increment financing *per se.*[24] Neverthe-

---

17. Title 62 O.S. Supp.1998 § 853(9) provides:

" 'Increment' means that portion of *ad valorem* taxes in excess of the amount of that portion of the taxes which are produced by the levy at the rate fixed each year by or for each such *ad valorem* taxing entity upon the base assessed value of the district or as to an area later added to the district, the effective date of the modification of the plan, or that portion of sales taxes, other local taxes or local fees collected each year reasonably determined by a formula approved by the governing body to be generated by the project, which may be apportioned for specific project costs or as a specific revenue source for other public entities in the area in which the project costs take place;"

18. Title 62 O.S. Supp.1997 861(A)(2), see note 1 supra.

19. Title 62 O.S. Supp.1997 § 861(E), see note 1, supra.

20. Title 62 O.S. Supp.1997 § 861(C), see note 1, supra.

21. Title 62 O.S. Supp.1992 § 868 provides in pertinent part:

"A. The powers of initiative and referendum, reserved by the Oklahoma Constitution to the people, are reserved to the people of every city, town or county with reference to the tax relief or incentives or exemptions or increment captured as authorized by Section 6C of Article X of the Oklahoma Constitution and as provided for in this act....

H. Whenever a referendum is demanded against any measure passed by the city, town or county governing body, or whenever an initiative petition is demanded, the question shall be submitted to the registered voters of the city, town or county for their approval or rejection at the next general municipal or county election."

22. *Scappoose Sand & Gravel, Inc.* v. *Columbia County,* 161 Or.App. 325, 984 P.2d 876, 880 (1999).

23. *South Bend Pub. Trans. Corp.* v. *City of South Bend,* see note 42, infra; *R.E. Short Co.* v. *City of Minneapolis,* see note 42, infra.

24. The Treasurer's answer brief, filed on November 22, 1999, provides in pertinent part at p. 1–2:

"... Appellees mis-characterize the County's arguments with regard to the issue of constitutionality. The County's position is that the project plan *as implemented* is unconstitutional and unlawful. This is because the City has not only misconstrued the requirements found in

less, the Treasurer asserts that because the ordinance [25] and § 861 [26] of the Act allow for the apportionment of *ad valorem* taxes for a period of twenty-five years that a debt is created requiring voter approval under the Okla. Const. art. 10, § 26. The Urban Renewal Authority and the Medical Authority argue that tax increment financing does not create a debt and that the constitutional provision is inapplicable. We disagree.

¶ 15 Although we have not addressed the constitutionality of tax increment financing as it relates to the Local Development Act, the Court considered the concept's validity in *Muskogee Urban Renewal Auth.* v. *Excise Bd. of Muskogee County*, 1995 OK 67, ¶ 24, 899 P.2d 624. [27] In *Muskogee,* the Court held that there was nothing unconstitutional in allowing municipalities to utilize tax increment apportionments to retire long-term debts. Nevertheless, we held that apportionments from *ad valorem* levies associated with the financing scheme remained subject to voter approval under art. 10, § 26. The *Muskogee* Court stated:

"In art. 10, § 26, the people reserve to themselves the right to approve any and all debts that will be paid with taxes levied and collected in subsequent fiscal years, which includes the right to approve the tax to be levied in subsequent years. Unless a debt is incurred within the confines of art. 10, § 26, ad valorem tax millage cannot be levied and apportioned for payment of the debt. That is, the specific debt limitations of art. 10, § 26 not only prohibit the creation of long-term indebtedness without assent of the voters, but also proscribe the raising and spending of ad valorem tax revenues for the payment of debts other than those incurred in compliance with its provisions. A long-term debt of an urban renewal authority that has not been presented to and approved by the voters as prescribed by art. 10, § 26 cannot be the lawful object of a legislative apportionment of ad valorem tax revenues." [Footnotes omitted.]

¶ 16 The Urban Renewal Authority seeks to distinguish *Muskogee* factually and on the grounds that it involved a different statutory scheme. *Muskogee* addressed tax increment financing of urban renewal costs under 11 O.S. Supp.1983 § 38–115 and § 38–120, *et. seq.* Despite allegations that the Act here and the legislative scheme considered in *Muskogee* differ, the manner in which tax increment financing is accomplished under both statutes is substantially similar. Under both legislative acts, urban renewal authorities are authorized to issue bonds which are not considered a debt of the municipali-

the 'Local Development Act' (62 O.S. § 851 et seq.) But also because the City has interpreted the Act in a manner inconsistent with the Oklahoma Constitution....

Additionally, neither Art. X, Sec. 6C nor the Local Development Act obviate the need to adhere to the requirements of Art. X, Sec. 26 of the Oklahoma Constitution. See *Muskogee Urban Renewal Authority v. Excise Board of Muskogee County*, 1995 OK 67, 899 P.2d 624. Yet, Appellees take the position that no voter approval is required...." [Emphasis is original.]

The School District's Brief in Chief, filed on November 12, 1999, provides in pertinent part at p. 10:

"... The School District does not argue that the use of such *ad valorem* tax revenue is unconstitutional, per se.... The School District envisions applications of the Act that would benefit the School District and serve a school purpose as required by the Constitution...."

An admission in the brief may be regarded as a supplement to the appellate record. *Wright v.*

*Grove Sun Newspaper Co., Inc.*, 1994 OK 37, ¶ 2, 873 P.2d 983; *Kwikset/Emhart v. Mayberry*, 1990 OK 112, ¶ 3, 800 P.2d 239; *Reeves v. Agee*, 1989 OK 25, ¶ 15, 769 P.2d 745; *Womack v. City of Oklahoma City*, 1986 OK 14, ¶ 10, 726 P.2d 1178.

**25.** Ordinance No. 19,875, Section 9, see p. 5, supra.

**26.** Title 62 O.S. Supp.1997 § 861(A), see note 1, supra.

**27.** We also considered a similar plan concerning special assessments on real property in *Application of Erick Hosp. Dist.*, 1968 OK 112, ¶ 23, 444 P.2d 216. In *Erick,* the Court held that the Hospital District Act of 1967 providing for annual assessments on real property in the district to pay interest and principal on bonds was unconstitutional since the hospital districts were not within the enumerated subdivisions of the state which could levy taxes on an *ad valorem* basis and that assessments for local improvements upon the property benefitted, resulting in a taking of property without just compensation.

ty;[28] the payment of the principal and interest on tax increment bonds are from apportionment funds containing *ad valorem* taxes;[29] a municipality may designate a tax increment district after notice and a hearing and a determination that the district achieves the objectives of the subject legislation;[30] there must be a determination of a base assessed value to be used as the starting point for the increment financing plan;[31] and apportionment may run for multiple years—under 68 O.S. Supp.1983 § 38–123 allocations may extend for a maximum of thirty years while under 62 O.S. Supp.1997 § 186(A) apportionment may not exceed twenty-five years.

¶ 17 Factually, the Urban Renewal Authority asserts that, unlike the legislation considered in *Muskogee,* the Act here is anchored in a constitutional provision and that no agreement independent of the Act obligates municipal government to continue allo-

cations to the tax increment fund. We agree that the Act implements art. 10, § 6C of the Okla. Const. and that § 6C anticipates the use of local taxes, incentives or exemptions to foster the kind of development sought to be accomplished under the tax increment plan. We also recognize that § 6C provides that the Legislature may set time periods for the exemptions. However, nothing in the language of art. 10, § 6C indicates that it is intended to affect any other constitutional provision. It contains no language impacting or altering the debt limitations of art. 10, § 26. The language of § 6C allows the Legislature to define the outer limit of time for which apportionment is allowed, it does not authorize the creation of long-term debts.[32] We held tax increment financing constitutional in *Muskogee* and we find it so here. Nevertheless, a finding that tax increment financing is constitutionally grounded does not prohibit construing the provisions consistent

28. Title 11 O.S.1981 § 38–115. Title 62 O.S. Supp.1992 § 863(G) provides:

"A tax apportionment bond or note issued pursuant to the provisions of this section is not a debt, liability, or obligation of the city, town or county creating or approving the plan, project or increment district. The bond or note does not give rise to a charge against the general credit or taxing powers of such city, town or county and is not payable except as provided by this act. Bonds or notes issued pursuant to the provisions of this section are not general resources of the state. A bond or note issued pursuant to the provisions of this section must state the restrictions of this subsection on its face."

29. Title 11 O.S.1981 § 38–115; 62 O.S. Supp. 1997 § 861(A)(2), see note 1, supra.

30. Title 11 O.S.1981 § 38–120; 62 O.S. Supp. 1992 §§ 855 and 856.

31. Title 11 O.S.1981 § 38–121; 62 O.S. Supp. 1997 § 862(A), see note 5, supra.

32. The dissent finds that the tax increment financing plan here does not create a debt within the meaning of art. 10, § 26. It does so by holding that when the voters amended the Constitution, adding the tax increment financing and tax incentive provision—art. 10, § 6C, see note 2, supra, they created an exception to the debt limitations of art. 10, § 26, see note 3, supra. Under the dissent's analysis, this plan—under which the City has made an unconditional pledge of *ad valorem* taxes for a period of twenty-five years—and any other tax increment financing or incentive scheme adopted pursuant to the Local

Development Act will not be subject to the constraints of art. 10, § 26. In addition, taxing and governmental entities involved in these financing plans need not consider the 5% limitation of indebtedness relating to the valuation of taxable property within the confines of their borders.

In *State ex rel. County Comm'n of Boone County v. Cooke,* see note 43 at 487, infra, the West Virginia Court considered the ramifications which would result from a finding that tax increment financing was not subject to constitutional debt limitation provisions. It determined that such a finding would defeat the purpose of constitutional debt restrictions—to protect the fiscal integrity of governmental entities. Furthermore, a finding that no debt existed would result in impairing the financial integrity of the State's existing tax structure. The South Dakota Court expressed similar concerns in *Meierhenry v. City of Huron,* see note 43 at 178, infra. It considered a similar scheme to result in a constitutionally prohibited debt because, ultimately, the "credit" of a governmental entity was its power to levy general taxes—when the power to levy a tax is pledged, the entity's "credit" is likewise pledged. See also, *Richards v. City of Muscatine,* see note 43 at 63, infra, applying the same analysis.

If the position of the dissent is adopted, local governmental units will be able to obligate, without a vote of the people, in essence an amount in excess of the property available to tax—for a period up to twenty-five years. Local communities will no longer be subject to a "cash and carry" analysis and may avoid the 5% limitation of art. 10, § 26 by creating a tax increment district—all without a vote of the people.

with the debt limitations of art. 10, § 26. In *Muskogee*, we acknowledged that the "characterization" of a debt did not alter its nature and:

> If a municipality becomes indebted pursuant to the tax increment financing legislation, such indebtedness must not violate the strictures of art. 10, § 26.

To hold differently would require us to strike debt limitation provisions from the Oklahoma Constitution, and to ignore the rule that constitutional provisions are construed to harmonize with each other with a view to giving effect to each and every provision.[33]

¶ 18 Finally, the Urban Renewal Authority asserts that it is clear under the statutory language that the tax increment bonds issued by the Medical Authority are not the debts of the taxing entities. Although 62 O.S. Supp.1996 § 863(G) specifically provides that tax apportionment bonds or notes issued pursuant to the Act are not debts of the city, town or county creating or approving the plan,[34] statutory declarations alone will not alter the nature of indebtedness when circumstances make it clear that an obligation has been incurred.[35] Ordinance No. 19,875 provides that tax increments "shall be apportioned and used to pay project costs ... of the Project Plan for a period not to exceed 25 years from the effective date of the approval of the Project Plan." Generally, duly enacted municipal ordinances have the same force and effect as statutes.[36] Absent a repeal of the ordinance [which is not anticipated by the Act until all project costs have been satisfied or twenty-five years have passed],[37] the municipality is obligated to apportion taxes to retire tax increment bonds perhaps for as long as twenty five years. Despite the language of § 863(G) providing that the bonds are not debts of the municipality, the ordinance clearly obligates payments until the bonds are retired or until twenty five years have passed—the clear language of the ordinance creates a debt.

¶ 19 Recently, in *Matter of the Application of Capitol Improvement Auth.*, 1998 OK 25, ¶ 1, 958 P.2d 759, *cert. denied*, 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998), we undertook an exhaustive review of the issue of debt financing within the meaning of the Oklahoma Constitution. In doing so, we considered art. 10, § 25,[38] requiring that before the state may enter into certain "debts,", a vote of the public is required. The constitutional provision at issue here—art. 10, § 26— is the counterpart of § 25 applying to political subdivisions.[39] The purpose of art. 10,

**33.** *Jones v. Winters*, 1961 OK 224, ¶ 42, 365 P.2d 357; *Latting v. Cordell*, 1946 OK 217, ¶——, 197 Okla. 369, 172 P.2d 397; *Hoyt v. Cordell*, 1946 OK 216, ¶——, 197 Okla. 386, 172 P.2d 414.

**34.** See also, Title 74 O.S.1991 § 7051, note 4, supra.

**35.** *State ex rel. County Comm'n of Boone County v. Cooke*, see note 43 at 487, infra; *Meierhenry v. City of Huron*, see note 43 at 177, infra; C. Michel, "Brother, Can You Spare A Dime: Tax Increment Financing in Indiana," 71 Ind.L.J. 457, 464 (1996) [Although most tax increment financing statutes explicitly provide that any debt incurred or bonds issued by a municipality are not to be considered a debt, several states have held that the plans are subject to constitutional debt limitations.]. See also, *Muskogee Urban Renewal Auth.* v. *Excise Bd. of Muskogee County*, note 10, supra.

**36.** *Weaver v. Bishop*, 1935 OK 1093, ¶——, 174 Okla. 492, 52 P.2d 853; In re *Seltenreich*, 1952 OK CR 250, 95 Okla.Crim. 250, 244 P.2d 587.

**37.** Title 62 O.S. Supp.1997 § 861(A)(2), see note 1, supra.

**38.** The Okla. Const. art. 10, § 25 provides in pertinent part:

"Except the debts specified in sections twenty-three and twenty-four of this article, no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law for some work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax to pay, and sufficient to pay, the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty-five years from the time of the contracting thereof. No such law shall take effect until it shall, at a general election, have been submitted to the people and have received a majority of all the votes cast for and against it at such election...."

**39.** *Matter of the Application of Capitol Improvement Auth.*, 1998 OK 25, ¶ 24, 958 P.2d 759, *cert. denied*, 525 U.S. 874, 119 S.Ct. 174, 142 L.Ed.2d 142 (1998).

§ 26 is to force cities and other political subdivisions to operate on a cash basis and to prevent indebtedness extending beyond one year without a vote of the public.[40]

¶ 20 In *Capitol Improvement*, we held that highway improvement bonds were not "debts" within the meaning of art. 10, § 25 because future legislatures were not bound to appropriate funds for their retirement. The full faith and credit of the state was not pledged because there was the prospect, but not the promise, of future appropriations. The legislation at issue in *Capitol Improvement* provides that "it is the intent of the Oklahoma Legislature" to appropriate sufficient monies to retire the debt created.[41] Here, the ordinance clearly delineates the legislative promise to apportion taxes for a maximum of twenty-five years.

¶ 21 In *Muskogee*, the city undertook the promise to pay through an independent contract with the lender responsible for the urban renewal project. Here, the municipality has obligated itself to apportion taxes for a period in excess of one year. Under the rationale of *Capitol Improvement*, the tax increment bonds are debts within the constitutional sense—they attempt to bind future legislative bodies—the governing bodies of the municipality, the county and the school district—to make apportionments through a clear promise that the payments will continue for a period up to twenty five-years.

¶ 22 The majority of courts considering tax increment financing have found the legislation constitutional against a variety of attacks.[42] However, there is a split of authori-

**40.** *State ex rel. Brown v. City of Warr Acres*, 1997 OK 117, ¶ 22, 946 P.2d 1140; *Del City v. FOP, Lodge No. 114*, 1993 OK 169, ¶ 5, 869 P.2d 309.

**41.** Title 73 O.S. Supp.1997 § 168.6(H) provides: "It is the intent of the Oklahoma Legislature to maintain the funding level of the State Transportation Fund as required in order for the Department of Transportation to fully pay any and all obligations incurred by the Department of Transportation with respect to agreements entered into by the Department of Transportation and the Oklahoma Capitol Improvement Authority pursuant to subsection D of this section."

**42.** *Delogu v. State*, 1998 ME 246, 720 A.2d 1153, 1155–56 (1998) [Tax Increment financing did not violate constitutional principles of public purpose doctrine or equal taxation.]; *State ex rel. Tomasic v. Unified Govt. of Wyandotte County/Kansas City*, 265 Kan. 779, 962 P.2d 543, 547–548 (1998) [Tax increment financing did not violate equal protection, provided appropriate guidance in delegating authority and did not violate debt limitations or pledge the full faith and credit of governmental units.]; *Tax Increment Financing Comm'n of Kansas City v. J.E. Dunn Constr. Co., Inc.*, 781 S.W.2d 70, 79 (Mo.1989) [Tax increment financing upheld against allegations that increased tax must be authorized by vote of people and constitutional attacks relating to uniform tax assessment and debt limitations.]; *In re Request for Advisory Opinion*, 430 Mich. 93, 422 N.W.2d 186, 188 (1988) [Tax increment financing not facially unconstitutional as prohibition on general rate of *ad valorem* taxes and extension of municipality's credit was for a public purpose.]; *Dennehy v. Department of Revenue*, 305 Or. 595, 756 P.2d 13, 18 (1988) [Tax increment financing statute upheld against constitutional attacks relating to legislative power, public purpose and equal taxation.]; *City of El Paso v.*

*El Paso Community College Dist.*, 729 S.W.2d 296, 299 (Tex.1986) [Texas constitution is not offended if *ad valorem* tax revenues are utilized for non-educational purposes and without the consent of school board trustees.]; *Wolper v. City Council of City of Charleston*, 287 S.C. 209, 336 S.E.2d 871, 874 (1985) [Tax increment bonds upheld against debt restrictions attack and allegations that plan impaired contracts.]; *Meierhenry v. City of Huron*, 354 N.W.2d 171, 175 (S.D. 1984) [Tax increment financing upheld against constitutional attacks relating to public purpose doctrine, election requirements, taxation for purpose levied, impairment of obligation of contracts, special law or prohibited exemption from taxation.]; *South Bend Pub Trans. Corp. v. City of South Bend*, 428 N.E.2d 217, 221–222 (Ind.1981) [Tax increment financing did not create a debt within constitutional meaning and did not violate either equal protection or due process guarantees nor result in the impairment of contracts.]; *State v. Miami Beach Redevelopment Agency*, 392 So.2d 875, 898 (Fla.1980) [Tax increment legislation upheld against constitutional attacks relating to public purpose and to requirement relating to necessity of elections affecting *ad valorem* tax distributions.]; *Sigma Tau Gamma Fraternity House Corp. v. City of Menomonie*, 93 Wis.2d 392, 288 N.W.2d 85, 95 (1980) [Tax increment financing upheld against constitutional attacks based on uniformity and public purpose doctrine.]; *Denver Urban Renewal Auth. v. Byrne*, 618 P.2d 1374, 1380 (Colo.1980) [Tax increment financing did not violate constitutional debt limitations provisions, constitutional prohibition against pledging of credit, was not local or special legislation and did not cause nonuniform taxation.]; *City of Sparks v. Best*, 96 Nev. 134, 605 P.2d 638, 640 (1980) [Tax increment financing legislation did not constitute unconstitutional delegation of legislative powers.]; *State ex rel. Schneider v. City of Topeka*, 227 Kan. 115, 605

ty on the issue of whether obligations issued in conjunction with tax increment financing

P.2d 556–57 (1980) [Tax increment financing: did not violate constitutional provisions requiring uniform and equal taxation; was not an unlawful delegation of legislative power; did not violate constitutional provisions requiring that levy of tax be for a specific purpose; and did not violate constitutional provisions requiring uniformity in distribution of tax money.]; *People ex rel. City of Canton v. Crouch,* 79 Ill.2d 356, 38 Ill. Dec. 154, 403 N.E.2d 242, 248 (1980) [Tax increment financing fulfilled constitutional requirement that municipal revenue be spent for legitimate public purpose, did not violate uniformity clause and was a general rather than a special law.]; *Metropolitan Development & Housing Agency v. Leech,* 591 S.W.2d 427, 430 (Tenn. 1979) [Tax increment financing upheld: as promoting municipal, county and state purpose; not constituting an unconstitutional diversion of taxes; and not amounting to an unconstitutional taking of property without consent or compensation.]; *.R.E. Short Co. v. City of Minneapolis,* 269 N.W.2d 331–333 (Minn.1978) [Tax increment financing served public purpose within meaning of constitution.]; *Tribe v. Salt Lake City Corp.,* 540 P.2d 499, 504 (Utah 1975) [Tax increment financing upheld against constitutional attacks relating to debt limitations or limitations for which taxes could be levied.]; *Richards v. City of Muscatine,* 237 N.W.2d 48, 64 (Iowa 1975) [Although tax increment bonds were a debt of the city, the financing scheme was upheld against constitutional attacks relating to due process, notice, delegation of the legislative power, due process and equal protection.]; *Walled Lake Consolidated School Dist. v. Charter Township of Commerce,* 174 Mich.App. 434, 437 N.W.2d 16–17 (1989) [Recognizing that tax increment financing had been upheld as constitutional and ruling school district's challenge untimely.]; *Kelson v. City of Pensacola,* 483 So.2d 77, 78–9 (Fla.App.1986) [Tax increment financing was not an unconstitutional diversion of county funds and did not impair contracts of county.]; Annot., "Validity, Construction, and Effect of Statutes Providing for Urban Redevelopment by Private Enterprise," 44 A.L.R.2d 1414, 1418 (1955) [In the overwhelming majority of cases in which the validity of redevelopment statutes have been questioned, the courts have upheld them.]; D. Mandelker, "Public Entrepreneurship: A Legal Primer," 15 Real Est.L.J. 3, 13 (1986) [Almost all state courts hold tax increment financing constitutional.]. But see, *Leonard v. Spokane,* 127 Wash.2d 194, 897 P.2d 358, 361 (1995) [Tax increment financing statute unconstitutionally diverted tax dollars from common schools to public improvements.]; *City of Portland v. Smith,* 314 Or. 178, 838 P.2d 568, 575 (1992) [Failure of legislature to pass implementing legislation along with constitutional provisions prohibited issuance of bonds for retirement of tax increment bonds.]; *Miller v. Covington Development*

are "debts" within constitutional confines.[43] In *State ex rel. County Comm'n of Boone Auth.,* 539 S.W.2d 1, 5 (Ky.1976) [Tax increment financing violated constitutional requirement that money collected for the purposes of education not be spent for any other purpose.].

**43.** *State ex rel. County Comm'n of Boone County v. Cooke,* 197 W.Va. 391, 475 S.E.2d 483, 494 (1996) [Tax increment financing plan created debt within meaning of constitutional provisions.]; *City of Hartford v. Kirley,* 172 Wis.2d 191, 493 N.W.2d 45, 48 (1992) [General taxing power of city real power behind incremental tax financing resulting in a debt within meaning of constitutional provisions.]; In re *Request for Advisory Opinion,* see note 42, supra [Financing method amounted to an extension of municipality's credit creating a debt for constitutional purposes.]; *Meierhenry v. City of Huron,* 354 N.W.2d 171, 175 (S.D.1984) [Tax increment bonds constituted debt of city.]; *City of Tucson v. Corbin,* 128 Ariz. 83, 623 P.2d 1239, 1242 (1980) [Because *ad valorem* taxes must be approved by voters, tax increment statutes allowing allocation of the taxes without a vote of the people created debt within constitutional provisions.]; *Richards v. City of Muscatine,* 237 N.W.2d 48, 64 (Iowa. 1975) [Although constitutional against a myriad of attacks, tax increment bonds were a debt of the city.]. Some authorities believe the advantages in administrative flexibility and circumvention of local political pressure creates a greater potential for abuse by redevelopment officials, particularly when projects appear economically feasible without such public assistance. Davidson, "Tax Increment Financing as a Tool for Community Redevelopment," 56 U.Det.J.Urb. L. 405, 408 (1978). See also, Note, "Urban Redevelopment: Utilization of Tax Increment Financing," 19 Washburn L.J. 536 (1980). But see, *State* ex rel. *Tomasic v. Unified Govt. of Wyandotte County/Kansas City,* note 42, supra [Tax increment financing did not create a debt or pledge full faith and credit of governmental units.]; *Tax Increment Financing Comm'n of Kansas City v. J.E. Dunn Constr. Co., Inc.,* note 42, supra [Tax increment financing did not create a debt within definition of constitution.]; *Wolper v. City Council of City of Charleston,* note 42, supra [Tax increment financing bonds were not subject to constitutional debt limitations.]; *South Bend Pub. Trans. Corp. v. City of South Bend,* note 42, supra [Tax increment financing did not create a debt within constitutional meaning.]; *Denver Urban Renewal Auth. v. Byrne,* note 42, supra [Tax allocation financing did not create a debt of the municipality.]; *Tribe v. Salt Lake City Corp.,* note 42, supra [Tax increment financing did not create debt of municipality.].

For a discussion of tax incremental financing and the debt issue, see, J. Anderson, "Tax Increment Financing: Multiple Adoption and

*County v. Cooke*, 197 W.Va. 391, 475 S.E.2d 483, 491 (1996), the West Virginia Court relied upon *Muskogee* in holding that its state's tax increment financing act resulted in the creation of a debt for constitutional purposes. Like the Oklahoma legislation, the act under consideration in *Cooke* specifically provided that bonds issued pursuant to the act did not constitute a debt of the political subdivision.[44]

¶ 23 The Michigan Supreme Court in *Request for Advisory Opinion*, 430 Mich. 93, 422 N.W.2d 186, 198 (1988) analyzed a local development act substantially similar to the one at issue here.[45] In so doing, it found that although tax increment financing was not unconstitutional on its face, the method of financing did amount to an extension of a municipality's credit creating a debt for constitutional purposes. The holding is premised on the fact that a municipality essentially gives away something—the tax increment—in the hope that general economic growth will result in the district.[46] The Michigan court distinguished bonds issued based on the municipality's ability to levy a property tax from those to be repaid from vehicular or gasoline taxes similar to the bonds in *Capitol Improvement*.

¶ 24 In finding that its state's tax increment financing statutes in *City of Hartford v. Kirley*, 172 Wis.2d 191, 493 N.W.2d 45, 51 created a debt within the meaning of its constitution, the Wisconsin court started with the same premise we expressed in *Capitol Improvement Auth.*—that constitutional debt restrictions do not prohibit creative financing.[47] As in the legislation at issue in *Cooke* and here, the tax increment bonds in *Kirley* provided that they were not debts of the municipality. While 62 O.S. Supp.1997 § 861(A) and the ordinance provide that tax increment funds "shall be apportioned", the Wisconsin statute requires the local legislative body to "irrevocably pledge"[48] the special fund for the payment of project costs and the municipality in *Kirley* promised not to terminate the increment district until project costs were paid.

¶ 25 In finding that there was a "constitutional debt" in *Kirley*, the Wisconsin court addressed an argument made here by the Urban Renewal Authority—that the bonds are essentially self-liquidating because, absent the project, there would be no *ad valorem* taxes collected above the base assessed value. The *Kirley* court dismissed the argument on the ground that it does not take into account that an increase in assessment may occur without the development project arising from inflation or improvements unrelated to the project. Recognizing that if the bonds were payable directly from the city's general property tax revenues, they would clearly constitute a debt within constitutional principles, the Wisconsin court found that the tax increment financing plan merely allowed the municipality to carve out a portion of general revenue for debt service of tax increment bonds. Other courts have agreed finding that when the general revenues of a municipality are applied to the retirement of tax increment bonds, the power to levy taxes has been implicated and the political subdivision

---

Growth," 45 Natl.Tax J. 155 (1990); C. Dudley, "Tax Incremental Financing for Redevelopment in Missouri: Beauty and the Beast," 54 U.M.K.C.L.Rev. 77 (1985); J. Davidson, "Tax–Related Development Strategies for Local Government," 13 Real Estate L.J. 121 (1984); J. Davidson, "Tax Increment Financing as a Tool for Community Redevelopment," 56 J.Urban L. 405 (1979).

**44.** W.Va.Code 13–2C–7 (1975) provides in pertinent part:

"... [T]he bonds and interest coupons issued under the authority of this article shall never constitute an indebtedness of the county, or of the municipality issuing the same, within the meaning of any constitutional provision or statute ..."

**45.** M.C.L.A. § 125.2151, *et seq.*

**46.** See also, *Richards v. Muscatine*, note 43 at 63, supra, providing:

"Ultimately, the 'credit' of a city is its power to levy general taxes. When it pledges all or part of that power, it pledges its credit and in a realistic sense incurs an obligation. We think the bonds must realistically be treated as a debt for the purposes of [the Iowa Constitution]."

**47.** *Matter of Oklahoma Capitol Improvement Auth.*, see note 39, supra.

**48.** Section 66.46(9)(b)4, Wis. Stats.1989–90 providing in pertinent part:

"... The local legislative body shall irrevocably pledge all or a part of such special fund to the payment of such bonds or notes...."

has pledged its "credit" in the constitutional sense.[49]

¶ 26 Debt limitations under art. 10, § 26 and under the Wisconsin Constitution[50] are calculated as a percentage of taxable property values. In this cause with the facts presented, we align ourselves with Wisconsin and the other jurisdictions determining that tax increment financing plans and the debt-servicing instruments associated with them may create a debt in within the meaning of the Okla. Const. art. 10, § 26.

¶ 27 In *Capitol Improvement*, we held that the Legislature's statement that it "intended" to appropriate monies for the retirement of bonds did not pledge the credit of the state or create a debt within the constitutional sense. Here, however, the ordinance provides that monies "shall be apportioned" for a period not to exceed twenty five years. Unlike the situation in *Capitol Improvement*, an unconditional pledge of the funds is made rather than a mere expression of the "intent" to continue payments. Under the facts of this case, the unlimited promise to allocate *ad valorem* taxes collected in the future to retire a long-term debt, creates a debt requiring voter approval under the Okla. Const. art. 10, § 26.

¶ 28 We note that when the ordinance was adopted in January of 1993, the City did not have the direction or teaching of either *Muskogee* or *Capitol Improvement* as guides. The original opinion in *Muskogee* was adopted on June 15, 1993, and the final opinion on rehearing was not promulgated until June 27, 1995—almost two years later. *Capitol Improvement* has only been a part of this state's jurisprudence since mandate issued on June 30, 1998.

## CONCLUSION

¶ 29 We do not doubt the salutary purposes of the Local Development Act [Act], 62 O.S. Supp.1992 § 850, *et seq.* Nevertheless, it is not this Court's duty to consider the desirability, wisdom, or practicality of fiscal legislation.[51] In construing constitutional debt-limitation provisions, it is the judiciary's duty to guard against indebtedness rather than modern methods of financing.[52] The question presented when art. 10, § 26 is considered is whether the municipality incurs a financial obligation after the year contracted to be paid from taxes levied and collected in subsequent fiscal years.[53] Here, the question is whether the municipality has found a legal way to raise funds for property improvements without incurring constitutional debt.

¶ 30 Tax increment financing under the Local Development Act [Act], 62 O.S. Supp.1992 § 850, *et seq.*, and the Okla. Const. art. 10, § 6C is facially constitutional. Nevertheless, because this tax increment financing plan, specifically Ordinance No. 19,875, obligates city government to allocate *ad valorem* taxes collected in the future to retire a long-term debt, it is subject to voter approval under the Okla. Const. art. 10, § 26. Our

49. *Meierhenry v. City of Huron*, see note 43, supra; *Richards v. City of Muscatine*, see note 43, supra; *City of Tucson v. Corbin*, see note 43, supra.

50. W.S.A. Const. Art. 11, § 3 provides in pertinent part:
"... (2) No county, city, town, village, school district, sewerage district or other municipal corporation may become indebted in an amount that exceeds an allowable percentage of the taxable property located therein equalized for state purposes as provided by the legislature. In all cases the allowable percentage shall be 5 percent except as specified in pars. (a) and (b):
(a) For any city authorized to issue bonds for school purposes, an additional 10 percent shall be permitted for school purposes only, and in such cases the territory attached to the city for

school purposes shall be included in the total taxable property supporting the bonds issued for school purposes.
(b) For any school district which offers no less than grades one to 12 and which at the time of incurring such debt is eligible for the highest level of school aids, 10 percent shall be permitted...."

51. *Matter of Oklahoma Capitol Improvement Auth.*, see note 39 at ¶ 9, supra; *In re Initiative Petition No. 347*, 1991 OK 55, ¶ 23, 813 P.2d 1019; *State ex rel. York v. Turpen*, 1984 OK 26, ¶ 7, 681 P.2d 763.

52. *Matter of Oklahoma Capitol Improvement Auth.*, see note 39, supra.

53. *State ex rel. Brown v. City of Warr Acres*, see note 40, supra.

holding is consistent with *Muskogee Urban Renewal Auth. v. Excise Bd. of Muskogee County*, 1995 OK 67, ¶ 24, 899 P.2d 624 providing that although facially constitutional, the tax increment financing plan at issue— under which the city undertook the promise to pay through an independent contract— was subject to voter approval under art. 10, § 26. It also conforms with the analysis of long-term debt financing for constitutional purposes undertaken in *Matter of Oklahoma Capitol Improvement Auth.*, 1998 OK 25, ¶¶ 35–40, 958 P.2d 759. The judgment of the trial court is reversed, and the cause is remanded with instructions to enter judgment against the plaintiff/appellee, Oklahoma City Urban Renewal Authority.

¶ 31 Because the tax increment plan, as adopted, does not survive the initial constitutional barrier, we need not address the assertions of the Commissioners and the School District that creation of the tax increment district required permission of all taxing entities. Additionally, although the trial court addressed the public purpose requirements of the Okla. Const. art. 10, § 14 and the surrender of taxing powers under art. 10, § 5, the parties have not asserted either of these constitutional provisions as challenges to the constitutionality of the Act on appeal. We limit our holding to the issues addressed herein. The particular set of facts of future litigation, or questions premised upon other constitutional provisions or issues of statutory construction may demonstrate problems not addressed here.

### REVERSED; CASE REMANDED WITH INSTRUCTIONS.

HARGRAVE, V.C.J., LAVENDER, and KAUGER, JJ., concur.

HODGES, OPALA, JJ., concur in deference to *stare decisis*.

WATT, J., concurring in result.

SUMMERS, C.J., BOUDREAU, and WINCHESTER, JJ., dissent.

SUMMERS, C.J., Dissenting, and joined by Justice BOUDREAU.

¶ 1 I respectfully dissent from the way the Court has interpreted two provisions of our Constitution, Okla. Const. Art. 10 §§ 6C and 26. The Court states that § 6C was not intended to affect other constitutional provisions, and does not impact or alter the debt limitations of Art. 10 § 26. I disagree. In making such a statement the Court negates the voice of the People that passed § 6C within the last decade. I do not address those issues left unresolved by the Court.

¶ 2 Article 10 § 6C has four paragraphs designated "A" through "D".[1] Paragraph "A"

---

1. Okla. Const. Art. 10 § 6C:

    A. The Legislature, by law, may grant incorporated cities, towns, or counties the ability to provide incentives, exemptions and other forms of relief from taxation for historic preservation, reinvestment, or enterprise areas that are exhibiting economic stagnation or decline. Relief from taxes imposed by other local taxing jurisdictions shall only be allowed by contractual arrangement with the municipal or county governing body. The law shall require public hearings before such relief may be granted and shall provide for the local initiative power and referendum of the people. The Legislature may set limitations on the cumulative incentives and relief provided pursuant to the provisions of this section, the time period for the exemptions, the geographical area of the jurisdiction covered, the percentage of the tax base of the jurisdiction eligible for the relief programs, and threshold limits of investment credit and jobs created.

    B. The Legislature, by law, may authorize that the cities, towns, or counties may specifically use local taxes and local fees, in whole or in part, for specific public investments, assistance in development financing, or as a specific revenue source for other public entities in the area in which the improvements take place and may direct the apportionment of the taxes and fees specified in this subsection for the purposes specified in this section. The Legislature may establish for this subsection, the same procedures and limitations authorized in subsection A of this section.

    C. The Legislature, by law, may authorize any city, town, or county to plan, finance and carry out the development or redevelopment of areas determined by the governing body of such city, town, or county to be unproductive, undeveloped, underdeveloped or blighted. The authority of the county shall be limited to the unincorporated areas of such county but any city, town or county may by agreement jointly plan, finance or carry out a development plan with any other public or private entity for one or more development projects within their respective boundaries.

    D. Any city, town, or county may exercise the provisions of this section separately or in combination with powers granted by any other laws of this state.

states that the Legislature may give specified political subdivisions the authority to provide relief from taxation as to certain geographical areas. Paragraph "A" also states that the Legislature may determine the time period for the tax relief and set limitations on the relief. Paragraph "B" states that the Legislature may authorize local taxes and fees to be used for "assistance in development financing" to accomplish the purpose of § 6C. Paragraph "C" states that the Legislature may authorize these same political subdivisions to "finance and carry out the development or redevelopment" of the relevant geographical area. Further, the Legislature is given the power to provide for procedures and limitations when political subdivisions exercise this power. Finally, paragraph "D" states that these provisions operate separately or in combination with other powers granted to the political subdivisions.

¶ 3 Pursuant to the constitutional authorization of § 6C the Local Development Act became law, 62 O.S.Supp.1992 §§ 850–869. The express purpose of the Act was to implement Art. 10 § 6C: "The Local Development Act shall serve to implement and execute Section 6C of Article X of the Oklahoma Constitution as approved by the voters of the State of Oklahoma on November 6, 1990...." This Act provides for issuing instruments of indebtedness:

> "Bonds" means evidences of indebtedness, tax apportionment bonds or other obligations issued by a public entity pursuant to the provisions of Section 863 of this title to finance project costs, pursuant to a project plan, which are to be repaid in whole or part with apportioned increments.

62 O.S.Supp.1992 § 853(3).

¶ 4 Project costs pay for the project or the improvement to the geographical area and are defined by statute. 62 O.S.Supp. 1992 § 853(13). Project costs include "financing costs, including interest paid to holders of indebtedness or other obligations issued to pay for project costs and premium paid over the principal amount of the obligations because of the redemption of the obligations before maturity...." 62 O.S.Supp.1992 § 853(13)(b). Project costs also includes fees for bond guarantees, letters of credit, and bond insurance. *Id.* at § 853(13)(h). Apportioned "increments" refers to a portion of ad valorem taxes. *Id.* at § 853(13)(h). And of course, tax increment financing may be used to finance project costs. *Id.* at § 861. Thus, tax revenue is used to pay the bonds, those obligations that are created to obtain the necessary funds to pay for the development or project.

¶ 5 The Legislature has stated that a city, town, or county "may exercise any powers necessary to carry out the purpose of this act, including the power to: ... Cause bonds to be issued by public entities as provided by Section 14 of this Act; ...." 62 O.S.Supp. 1992 § 854(3), *citing,* 62 O.S.Supp.1992 § 863. Section 863 begins by stating that with the approval of the governing body, "a public entity may issue tax apportionment bonds or notes, the proceeds of which may be used to pay project costs pursuant to the plan." *Id.* at § 863(A). The Court's interpretation of § 6C has placed any bonds issued pursuant to § 6C and the Local Development Act under the limitations of § 26.

¶ 6 The Court examines the language of § 6C and concludes that nothing therein shows an intent to affect another constitutional provision. One problem with this conclusion is that § 6C gives to the Legislature powers in excess of the express limitations of § 26. For example, Art. 10 § 6C states that with regard to the constitutionally allowed exemptions: *"The Legislature may set* limitations on the cumulative incentives and relief provided pursuant to the provisions of this section, *the time period for the exemptions,* the geographical area of the jurisdiction covered, *the percentage of the tax base of the jurisdiction eligible for the relief programs,* and threshold limits of investment credit and jobs created." Okla. Const. Art. 10 § 6C(A). (emphasis added) Section 6C clearly states that the Legislature may determine the limitations on the amount of relief provided and the time the relief is provided. But § 26 states that all indebtedness of a public entity may not exceed five percent (5%) of the valuation of the taxable property

of the entity indebted.[2] The Court has used the general language in § 26 to negate the Legislature's specific power granted by the Constitution in Art. 10 § 6C.

¶ 7 Does § 6C amend § 26? To answer the question we would examine the language actually used in § 6C to determine if it affects other constitutional provisions, although they may not be expressly named in the amendment.[3] As we said in *In re Initiative Petition No. 259, etc.,* 1957 OK 167, 316 P.2d 139: "Since the Constitution and statutes make no requirement that a proposed amendment refer to the Constitution or the section to be amended, and since the proposed amendment would, if adopted, amend any section of the Constitution in conflict therewith, we conclude that it is not necessary for the text of the proposed amendment to refer to the Constitution or any section thereof." *Id.* 1957 OK 167, at ¶ 25, 316 P.2d at 145.

¶ 8 Section 6C could be argued to operate as a modification or amendment to Art. 10 § 26. It has long been the rule in this State that where there is inconsistency there is also repeal, or amendment, or modification. Although a repeal or amendment by implication is not favored, an amendment on the same subject matter will suspend inconsistent provisions in a former provision. *Adams v. City of Hobart,* 1933 OK 646, 166 Okla. 267, 27 P.2d 595, 599; *In re Initiative Petition No. 259, etc.,* 1957 OK 167, ¶ 23, 316 P.2d 139, 144.

¶ 9 But we need not answer the question. There is no true inconsistency, and that is because Art. 10 § 26 starts with the phrase: "[e]xcept as herein otherwise provided, . . . ."

Almost seven decades ago the argument was made to this Court that similar language found in Art. 10 § 9 referred to solely those provisions in that section, and not to Article 10 §§ 26 and 27. *Adams v. City of Hobart,* 1933 OK 646, 166 Okla. 267, 27 P.2d 595, 597–598. We rejected that interpretation, quoting from an earlier case stating that "except as herein provided" referred to other provisions of the same subject matter in Article 10, namely §§ 26, 27, and 28. *Id.* 27 P.2d at 598, *quoting, Kirk v. School Dist. No. 24, Greer County,* 1925 OK 195, 108 Okla. 81, 234 P. 596. I therefore conclude that when the People enact a provision allowing for public financing of construction projects via tax revenues, and amend Article 10 of the Constitution, that amendment should be construed as one of those circumstances "except as herein provided" specified by Article 10 § 26.

¶ 10 We look to the plain language of our Constitution to discern its meaning. *Oklahoma Electric Cooperative, Inc. v. Oklahoma Gas & Electric Co.,* 1999 OK 35, ¶ 7, 982 P.2d 512, 514. Section 6C refers to "development financing", and that "[t]he Legislature, by law, may authorize any city, town, or county to plan, finance and carry out the development or redevelopment of areas . . . ." This public financing for development of "unproductive, undeveloped, underdeveloped or blighted" areas is in accordance to a plan that is funded from tax revenues and as calculated from a tax base determined by the Legislature via § 6C. *And the constitutional amendment expressly states the Legislature may grant our cities "exemptions and other forms of relief from taxation" and may set "the time period for the exemptions [and] the*

2. That section does allow specific entities to create debt up to 10% of the value of the property in some circumstances: " . . . if a school district has an absolute need therefor, such district may, . . . incur indebtedness to an amount, including existing indebtedness, in the aggregate exceeding five percent (5%) but not exceeding ten percent (10%) of the valuation of the taxable property therein, . . . ." Okla. Const. Art. 10 § 26. Similar limits are provided for a "city or town" by § 26.

3. One example of this principle is shown by *Ethics Commission v. Cullison,* 1993 OK 37, 850 P.2d 1069. We said that the provisions of Article 29 of our Constitution show that "[t]he Legisla-

ture cannot control the ethical conduct of state officials by legislative enactments that completely bypass the Commission's rule-making authority." *Id.* 1993 OK 37 at ¶ 18, 850 P.2d at 1076. It is also true that the Legislature's power shall extend to all rightful subjects of legislation. Okla. Const. Art. 5 § 36. It is also true that Article 29 does not expressly mention Art. 5 § 36. But in *Ethics Commission* we did not conduct a vain search in Article 29 for express references to other related constitutional provisions, we gave effect to the intent Article 29 by examining and giving effect to its language, although it impacted upon other constitutional provisions.

*percentage of the tax base ... eligible for the relief programs...."* § 6C(A).

¶ 11 When rules of construction are used to give meaning to constitutional provisions, those provisions are construed using the usual rules of statutory construction, and a specific provision prevails over one of a general nature. *Cowart v. Piper Aircraft Corp.,* 1983 OK 66, 665 P.2d 315, 317; (rules of construction applied to statutes are applied to constitutional provisions); *Tulsa County Deputy Sheriff's F.O.P. v. Board of Cnty. Comr's of Tulsa Cnty.,* 1988 OK 44, ¶ 13, 959 P.2d 979, 981, (specific statute controls general). Thus, the specific § 6C would control the more general § 26. Further, construction of constitutional provisions in *pari materia* with each other should be construed together with other statutes on the same subject as part of a coherent system. *Cowart v. Piper Aircraft Corp.,* 1983 OK 66, ¶ 4, 665 P.2d 315, 317. Recognizing § 6C as an exception to § 26 accomplishes this result. If § 6C is not an exception to § 26 then the § 26 limitation of indebtedness to 5% of the valuation of taxable property would control, and the § 6C relief for blighted areas is virtually meaningless.

¶ 12 I would find it remarkable if this Court were to conclude that 5% of the value of property in an undeveloped or economically blighted area was the constitutionally mandated limit to the public indebtedness of a § 6C project, when the Local Development Act pursuant to the Constitution authorizes the increment in tax revenues to be used to generate capital for investment. Members of this Court have recognized that our cities, towns, and counties must "compete on a nation-wide level to attract new industry into their locality", and tax increment and bond financing are important tools when engaging in such competition. *State ex rel. Brown v. City of Warr Acres,* 1997 OK 117, ¶ 9, 946 P.2d 1140, 1148, (Kauger, C.J., joined by Summers, V.C.J., and Watt, J., concurring). I would not deny our cities the opportunities afforded by Oklahoma Constitution Article 10 § 6C. I respectfully dissent from the opinion of the Court.

WINCHESTER, J., dissenting.

¶ 1 The case at bar involves the interpretation of Article 10, §§ 6C and 26 of the Oklahoma Constitution. The majority holds the tax increment financing plan adopted under the Local Development Act, 62 O.S. Supp. 1992, § 850, *et seq.,* and § 6C, creates a prohibited debt within the meaning of § 26. For the reasons set forth herein, I would declare § 6C an exception to the debt limitations of § 26.

¶ 2 When the people of Oklahoma voted to adopt § 6C, they authorized the Legislature to provide tax incentives for economic development. The implementing legislation (Local Development Act) vests the Legislature with the power to control numerous facets of local development projects, including incentives and exemptions from taxation, project procedures, limitations on the use of local taxes and fees, length of indebtedness, geographic area of the jurisdiction affected and percentage of tax base. *See* 62 O.S. Supp. 1997, § 861. In the instant case, a "governing body" as defined by 62 O.S. Supp.1997, § 853(7), passed Ordinance No. 19,875 to approve the Oklahoma Health Center Economic Development Project Plan and establish Increment District Number One.

### RULES OF CONSTRUCTION

¶ 3 The more recent, specific provisions of § 6C adopted at the election held November 6, 1990, and its implementing legislation, adopted in 1992, must be given effect over the prior, general provisions of § 26. *See Brown v. Marker,* 1965 OK 172, ¶ 19, 410 P.2d 61, 66. Since § 6C provides local initiative power and referendum of the people, it adequately addresses the interests met by § 26 of voter assent to indebtedness that exceeds one year.

"In the construction of the statutes, harmony, not confusion, is to be sought. The true rule has often been said to be that, where two acts or parts of acts are reasonably susceptible of a construction that will give effect to both and to the words of each, without violence to either, it should be adopted in preference to one which, though reasonable, leads to the conclusion that there is a conflict."

695

*Forston v. Heisler,* 1959 OK 122, ¶ 10, 341 P.2d 252, 255.

¶ 4 Construction of a constitutional provision must not be so strict as to defeat the purpose of its adoption. *Lone Star Gas Co. v. Bryan County Excise Board,* 193 Okla. 13, ¶ 3, 141 P.2d 83, 85. In its opinion, the majority so errs. In declaring Ordinance No. 19,875 unconstitutional, the majority ignores the purpose of § 6C that is stated in plain language: to allow the Legislature to grant "incorporated cities, towns, or counties the ability to provide incentives, exemptions and other forms of relief from taxation for historic preservation, reinvestment, or enterprise areas that are exhibiting economic stagnation or decline." We should follow the Legislature's practicable construction of § 6C to sustain constitutionality, since it will not do violence to the fair meaning of the words. By recognizing the exception provided in § 6C, we do this and we also harmonize the two constitutional provisions at issue.

¶ 5 Although the bonds in the instant case will be retired from the tax increment increase over the original base value used to calculate *ad valorem* taxes, it is important to note that the project expenditures will result in tangible assets such as parking facilities and the bio-medical and technological research and development park. These tangible assets will generate revenues, such as parking fees and office space rents, which also could be utilized to retire the bonds.

### CONCLUSION

¶ 6 Accordingly, I would hold that Article 10, § 6C of the Oklahoma Constitution constitutes an exception to the debt limitations of Article 10, § 26.